**The UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Irving E. MORRIS, Defendant-Appellant.**

No. 11371.

United States Court of Appeals
Seventh Circuit.

July 28, 1955.

Rehearing Denied Aug. 30, 1955.

Certiorari Denied Nov. 21, 1955.

See 76 S.Ct. 179.

**92**

Stephen Lee, Chicago, Ill., for appellant.

Robert Tieken, U. S. Atty., Edward J. Calihan, Jr., Asst. U. S. Atty., Chicago, Ill., for appellee. John Peter Lulinski, Anna R. Lavin, Asst. U. S. Attys., Chicago, Ill., of counsel.

Before FINNEGAN, SWAIM and SCHNACKENBERG, Circuit Judges.

FINNEGAN, Circuit Judge.

A jury convicted defendant Morris under a conspiracy count in a three-count indictment which, in substance, charged Morris and Richard (Dixie) Richmond with unlawful possession of counterfeit $20 Federal Reserve Notes and intent to pass, utter, publish and sell. Count I charged these men with possession of one such $20 note, count II alleged possession in each of them of five thousand $20 notes, and count III, charged Morris and Richmond with conspiracy to pass, utter, publish and sell, with intent to defraud and with possession, with intent to defraud of $100,000 in counterfeit $20 notes. Found not guilty on counts I and II, Morris was sentenced to the custody of the Attorney General for 5 years on count III. Jury disagreements terminated two previous trials of Morris under this same indictment originally filed June 3, 1949. His co-defendant Richmond entered a guilty plea and received punishment of 10 years imprisonment.

In this appeal, defendant asks us to enter a judgment of acquittal because of (i) certain asserted erroneous rulings of evidence concerning acts, and declarations of an alleged conspirator in Morris' absence and because, it is urged, no proof *aliunde* of the conspiracy has been established, (ii) challenged instructions, (iii) the trial judge's remarks to jurors on *voir dire* examination and, (iv) refusal to allow defendant's motion for judgment of acquittal interposed at the close of all evidence and after the jury's verdict.

When reviewing this record mirrored against defense assignments of error, a marginal note once adopted by Judge Leahy comes to mind; " 'The picture of conspiracy as a meeting by twilight of a trio of sinister persons with pointed hats close together belongs to a darker age.' "[1] Indeed, there is an undisputed line of cases demonstrating that evidence of an express agreement among alleged coconspirators is unnecessary. "It is seldom capable of proof by direct testimony and may be inferred from the things actually done. It is enough if the minds of the parties meet and unite in an understanding way with the single de-

---

1. William Goldman Theaters v. Loew's Inc., 3 Cir., 1945, 150 F.2d 738, 743, note 15..

sign to accomplish a common purpose, which may be established by circumstantial evidence or by deduction from facts from which the natural inference arises that the overt acts were in furtherance of a common design, intent and purpose." United States v. Gordon, 7 Cir., 1943, 138 F.2d 174, 176; Phelps v. United States, 8 Cir., 1947, 160 F.2d 858, 867, reflects yet another facet of this same reasoning: "Such a joining of intentions into a conspiracy may, and ordinarily only can, be established by inference from evidence of relationships and conduct and other probative circumstances."

From the evidence favorable to the Government, the jury could reasonably have believed that the following acts and events took place. A government informer, Jack Richter, was introduced to Morris by Bob Aldrich, a bookie, in February, 1949, at the Chicago Steak House in Los Angeles, California. Having said "hello" to Morris, the witness' testimony, related without objection, best describes what followed:

"Q. Well, did Aldrich have a conversation with him in your presence? A. Yes. Aldrich told Mr. Morris that I was the man who was going to take the counterfeit money, and * * *

"Q. Mr. Morris reminded him that any counterfeit money that was dealt in had to be dealt in $50,000 bundles." (T.R. 24).

Several days before his initial introduction to Morris, Richter, Morris and Aldrich were sitting at a bar, Richter was seated next to Aldrich, one stool away from Morris, and Richter overheard and related this conversation from the witness chair:

"Mr. Morris told Bob Aldrich that he had some counterfeit $10 bills, and asked him if he knew someone who wanted to buy them, or if Bob Aldrich wanted to handle them himself." (T.R. 25).

Richter further said that when he overheard that conversation the bartender and Dixie Richmond, co-defendant, were present. After his first meeting with Morris, Richter had several conversations with Richmond. On April 15, 1949, Richter received government exhibits 1, 1A, and 2, consisting of the following envelope, letter and a counterfeit $20 bill.

(Front)

"J. Richter
"c/o Chicago Steak House
"8th and Figuero   931 W 8
"Special Air Mail Los Angeles Calif."

(Back)

"M. Carson
"2430 N. Clark
"Chicago, Ill.
"April 15, 49"

Exhibit 1A

"New Lawrence Hotel
"1020 Lawrence Avenue
"Chicago 40, Illinois
"Telephone
"Long Beach 1–2100
"Rick:
"This is a sample price is up to $20 a hundred no less than a 100,000 at one time. I want this one back. Will call you Friday or Saturday.
"Dix."

Richter took the letter and $20 note to Assistant Special Agent in Charge Victor D. Carli, Los Angeles Office, U. S. Secret Service. Richter, subsequently called Diversey 8–8142, and spoke with Richmond, several times, in Carli's presence. An oral stipulation between counsel for plaintiff and defendant, made part of this record established that Diversey 8–8142 is the number of the bar telephone, used by the public at the Tropical Nights, Inc., 2430 North Clark Street, Chicago, Illinois, an Illinois corporation of which Morris was one of the incorporators and president—up to the last report filed January 20, 1949.

On April 26, 1949, Agent Carli and Richter arrived in Chicago, and registered at the New Lawrence Hotel, Lawrence Avenue and Sheridan Road. A series of conversations were had with Richmond between April 26 and May 2, 1949, but the substance of these exchang-

es was not introduced by the government at this juncture. May 2, 1949. was the date on which Richmond went to the New Lawrence Hotel and met Richter and agent Carli. Richter testified that about 8 o'clock A.M., he observed Carli and Richmond leave the Hotel, enter the James Restaurant and thereafter Richter saw Morris enter that Restaurant. Agents Carli and Moore also observed this movement by Morris. Shortly thereafter Morris was seen leaving the James Restaurant followed, above five minutes later, by Carli and Richmond who returned to the Hotel where Richter had remained.

Richmond, Richter and Carli, then, went to the Hotel safe where Carli had put a package purporting to contain genuine currency in the sum of $30,000.[2] About 10 o'clock in the evening, of that same day, Richter met Richmond in front of the New Lawrence Hotel. Richmond arrived at that location as a passenger in a Veterans taxicab driven by government witness Steve Agenlian. Richter walked over to the cab where Richmond "frisked" him. Richter stated that he observed Morris seated in his (Morris') green Oldsmobile convertible, about a car-length behind that Veteran's taxicab. Corroboration on this point came from Secret Service Agents Cohen, Mroz and Boteler, all of whom testified for the government.

Traveling in Agenlian's taxi, Richter and Richmond went to a building which they entered, and then proceeded to a ninth floor room where they picked up a suitcase with $100,000 in counterfeit notes. Richter and Richmond then left the building through the Clarendon Avenue entrance; Richter was carrying the bag. The taxicab was waiting for them. According to Richter, Morris was following them in his car. Once again in the taxi, Richmond and Richter moved to the southwest corner of Wilson Avenue and Broadway where they left the cab and entered the "L" station. There, Richter selected a locker and deposited the bag. Agents McLaughlin and Goldman who were on duty in that station observed and corroborated the actions centering about the locker. Richmond pocketed the locker key.

A sidelight here, appears in Richter's testimony at the point where he said: "Well, we left the money and when we started out I asked him if we couldn't take another cab, and he asked me why, and I said, well, I had seen Mr. Morris walk over and talk with the cab driver. He told me, no that we would have to take the same cab." [3]

Several doors away from the "L" station, Richter called Carli at the latter's room in the New Lawrence Hotel. Then these two men proceeded, in the same taxi, to that Hotel and parked outside. According to Richter, he saw Morris parked right behind them in the green Oldsmobile and Richmond got out of the cab and said "something" to Morris. Testimony given by Agents Deckard and Mroz, on behalf of the government supplied corroboration on this point. Richmond thereafter rejoined Richter. About this time agent Carli emerged from the New Lawrence Hotel and proceeded along Lawrence Avenue. Then Agenlian's cab, followed by Morris in the Oldsmobile, moved across the intersection of Sheridan Road and Lawrence Avenue. As Agent Carli traveled along he was trailed, in turn, by agents Cohen and Mroz. Just east of Sheridan Road— on the south side of Lawrence Avenue, Harry D. Anheier (the Special Agent-in-charge, U. S. Secret Service in Chicago, who also testified below) and Agent Boteler moved toward the taxicab. Carli reached Agenlian's vehicle and engaged Richmond and Richter in conversation.

---

2. There is testimony to the effect that on the morning of May 2, 1949 Richmond went to the New Lawrence Hotel where Carli showed him $30,000 in lawful currency for the purchase of 5000 counterfeit twenty dollar bills from Richmond.

3. A defense motion to strike the testimony quoted in text, was overruled (T. R. 247).

Agents Anheier and Boteler approached the taxi from its rear; when Boteler identified himself, Richmond made a quick move toward his pocket and Boteler shot him in the forehead.

Just about the time of this shooting the green Oldsmobile approached and then passed the halted cab. Agents Anheier, Boteler and Carli identified Morris as the man each of them observed in the Oldsmobile. Ordered to stop or be shot, by Boteler, Morris stopped and was arrested.

Using the locker key agents took the bag from the locker which had been under constant surveillance by other agents.

George LeCuyer, manager of the Chicago Steak House, testified that he observed Morris, Richmond, Richter, and Aldrich in conversations together during February and March, 1949 at the House.

Taking the stand in his own defense Morris testified that he had known Richmond since 1944, but when he (Morris) went to California he did not know Richmond was there. But Morris stated that LeCuyer told him a Mr. Richmond had been inquiring about Morris.

When accounting for his own presence at the various and sundry points in Chicago, just related, Morris testified Richmond owed him a "couple of hundred dollars" for a year or two and on the evening in question he (Morris) was moving from point to point with Richmond because the latter, having promised to repay that loan told Morris to meet him, once they met, Richmond was shortly going to pay Morris, hence the latter was simply waiting on the debtor Richmond that May evening. On cross-examination Morris testified that he flew back to Chicago from California and Richmond drove Morris' car from California to Chicago, for which Richmond received $75 or $100. Morris denied talking about counterfeit money or having ever seen Richter before his court appearance in January, 1950.

George Anders, testifying for the defense related his meeting with Morris at about 11 o'clock, May 2, 1949, saying further that he and Morris remained together until about 9–9:30 that evening. Anders also testified that Morris told him he had a 10 o'clock appointment.

This record reflects evidence of conversations between Agent Carli and Richmond about: ten dollar counterfeit notes, two cashier's checks for $22,000 and $10,000, respectively drawn on the Bank of America, payable to John Rosellini (a name used by Carli for this affair). Agent Carli also testified that he listened to toll calls between Richter and Richmond, moreover Carli related the plans he laid out with Richmond to use the Wilson Avenue "L" station locker—which crystallized the events of May 2, 1949,

Our narration of certain facts is only intended to present an overview of the evidence reflected by this record. We have presented it in even more detail, perhaps than is necessary to dispose of the appeal. Yet enough is reported, we think, to show the basis for our holding that the defense motions were correctly denied. United States v. Aman, 7 Cir., 1954, 210 F.2d 344; United States v. Yeoman-Henderson, Inc., 7 Cir., 1952, 193 F.2d 867, 868. Nor is it necessary to extract each piece of testimony against which defense counsel lodged an objection, in order to dispose of Morris' basic contention resting upon the evidentiary aspect of this appeal. Actually defense counsel is recorded as having preserved a standing objection to lines of inquiry by government counsel which defendant contended were pursued before a conspiracy between Morris and Richmond was established.

■ Conspirators seldom sign articles of partnership in crime which may thereafter be conveniently put into evidence by the prosecution. United States v. Crowe, 7 Cir., 1951, 188 F.2d 209, 212. "Overt acts of the parties" it was pointed out in the Crowe case, "may be considered with other evidence and attending circumstances in determining whether a conspiracy exists, and where the overt acts are of a character which are usually, if not necessarily done pursuant to a previous scheme and plan, proof of the

acts has a tendency to show such pre-existing conspiracy, so that when proven they may be considered as evidence of the conspiracy charged. (Citing.)" Id. 213.

■ Commencing with the first confrontation by Morris of Richmond in California and continuing to the climax of gun-play in Chicago, it is clear that a jury could find Morris' presence here and there in the mosaic of events was hardly ascribable to accidental isolated phenomena. It is curious that a debtor would invite his creditor to follow him (Richmond) around while the debtor busily engaged in committing a felony. In our opinion independent evidence against Morris had been adduced, below, prior to the government's offer of Richmond's statements about which defendant complains. We think Mr. Justice Minton cogently summarized the basic principles applicable here, when delivering the majority opinion in Lutwak v. United States, 1953, 344 U.S. 604, 617, 73 S.Ct. 481, 489, 97 L.Ed. 593:

> " * * * Declarations of one conspirator may be used against the other conspirator *not present* on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statements of a party. * * * " (Italics added.)

At bar the district judge first permitted Richter to testify about the *acts* of Richmond, but not conversations. But Richter had already repeated several statements uttered by Morris pertaining to counterfeit bills. Testimony describing Richmond's statement followed later in the trial. We think Morris had been linked sufficiently with Richter and Richmond so that the trial judge's discretion was unabused when he permitted introduction of the acts and declarations against which defendant levels his challenge. United States v. Von Clemm, 2 Cir., 1943, 136 F.2d 968, 971.

Whatever intimations defendant envisages this Court as having made in United States v. Moloney, 7 Cir., 1952, 200 F.2d 344, 346, the case is unavailing here on Morris' contention that the jury returned inconsistent verdicts. We recognized the value of United States v. Bazzell, 7 Cir., 1951, 187 F.2d 878, in our Moloney opinion and apply it here.

Careful consideration of those remarks, challenged here by defendant, made to jurors by the district judge during the *voir dire* examinations has shown us there is absent any sound reason for overturning the jury's verdict. Seasoned defense counsel was apparently satisfied that the trial judge straightened out the situation and recorded no further objection. United States v. Kirby, 2 Cir., 1949, 176 F.2d 101.

Some of the instructions attacked by the defense refer to the counts on which Morris was found not guilty. From the colloquy reported in this record it is quite clear that the matter of instructions received considerable attention. We say that defense counsel's generalized objection to the trial court's illustration of circumstantial evidence by reference to "snow falling during the night" melts away under Rule 30, Fed.Rules Crim. Proc., 18 U.S.C.A.

Nor does defendant's contention springing from the government's rebuttal evidence warrant disturbing this verdict. Indeed, after examining all of the various points urged upon us by defendant we found they were similarly insubstantial and without merit.

Because of the final argument sponsored by the defendant in the concluding part of his brief we point out that on page 252, transcript of record, Richter under redirect examination testified that he went to see Agent Carli *after* he overheard the conversation between Aldrich and Morris. On pages 27–28 of the defendant's brief it is urged, *inter alia* that Richter " * * * had communicated with Agent Carli before he ever *saw* this defendant," and we are cited to "Tr. 249" in support. But page 249 reveals that defense counsel interrogated Richter about seeing Agent Carli before Richter

*"met"* or was "introduced" to Morris. Jury verdicts are not annulled by such semantic jugglery.

Finding no reversible error in this record, the judgment is affirmed.

Affirmed.