**UNITED STATES of America**

v.

**John B. NICOSIA.**

**No. 72 H Cr. 108.**

United States District Court, N. D. Indiana, Hammond Division.

June 20, 1973.

John Wilks, U. S. Atty., N. D. of Indiana, South Bend, Ind., and Frank J. Kimbrough, Asst. U. S. Atty., Hammond, Ind., for plaintiff.

William A. Barnett, Chicago, Ill., Marshall J. Goldsmith, East Chicago, Ind., for defendant.

## MEMORANDUM OPINION AND ORDER

PERRY, Senior District Judge (Sitting by special designation).

This case grew out of an ingenious scheme by officials of the Northern Natural Gas Company to bribe public officials in order to speed and smooth the way for construction of a pipeline running from DuPage County through Cook County, Illinois and Lake County, Indiana to the lakefront at East Chicago, Indiana.

In September 1972 the Northern Natural Gas Company, two of its subsidiaries and two corporate officers were indicted in the United States District Court for the District of Nebraska at Omaha in connection with the scheme and charged with engaging in an illegal conspiracy. Also named in the same indictment were several public officials in the area through which the pipeline ran. They were charged with accepting bribes for using their influence to smooth the way for the pipeline's construction. All were charged in Count I of the indictment with violations of Title 18, United States Code, Sections 1952 and 1341, and Title 26, Sections 7201 and 7206(1).

Among the public officials named in the indictment at Omaha was John B. Nicosia, a physician who served as Mayor of East Chicago, Indiana from 1964 to 1971 and during the period in question. He was not brought to trial at Omaha as some of the other defendants were. Defendant Nicosia was tried before this court in May 1973 at Hammond in case numbered 72 H Cr 108. The conspiracy indictment numbered 73 CR 10 was transferred from Nebraska and consolidated with two other counts under 72 H Cr 108 for trial. In this case the Government alleged Nicosia accepted and received one bribe of $9,500 in 1966 and another of $5,000 in 1967. Nicosia was also charged, under Title 26, United States Code, Section 7201, in Counts II and III of said consolidated cases with omitting and failing to report these two cash payments which he allegedly received as bribes as taxable income on his 1966 and 1967 Federal income tax returns.

A jury found Nicosia not guilty of the charge of conspiracy in Count I and guilty as to Counts II and III involving his income tax returns. Defendant Nicosia made a motion for a judgment of acquittal at the end of all the evidence. The court did not rule upon the motion but took it under advisement and sent the case to the jury. The court has now heard further argument of counsel for the parties on the motion.

It is undisputed that a criminal conspiracy did exist and that certain of the individuals and corporations named in the Omaha indictment were involved. It was a sordid affair, conceived prior to 1966 and continuing through 1969, and the scheme to bribe public officials was cynically undertaken.

The gas company and its subsidiaries hired Rochester, Goodell, Moldovan and Spain, Engineers, Inc. of Salem, Illinois to plan the pipeline and to make the necessary acquisitions and arrangements for easements and to perform all necessary services. An account, the "R.G.M. & S. Escrow Account", was set up at a bank in Salem, Illinois. Its agents were

Frank M. Rochester, Warren B. Goodell, Earl Moldovan and William L. Spain, individually, of the engineering firm bearing their names. The stated purpose of the escrow was to provide cash for acquisition and approval of rights of way, licenses and permits for the pipeline and to pay all costs. Morrison Construction, Inc. of Hammond, Indiana was employed to construct the pipeline. James R. Morrison, the principal owner and president of Morrison Construction, supervised and carried out the construction work under the direction of Rochester and Spain, officers of the engineering firm.

The evidence before this court revealed that the actual purpose of the escrow was not only to pay for lawful acquisitions of rights of way but was to provide money for a fraudulent scheme whereby Rochester, Goodell, Moldovan and Spain would each individually render statements for alleged services not actually rendered, obtain payment of money from the escrow account, include the amount in his Federal income tax return, pay the tax thereon, and instead of retaining the remainder turn it over to Frank Rochester, who then coverted it into old $20 U.S. bills and delivered same to James R. Morrison for use in bribing whatever public officials he chose to bribe. The undisputed evidence is that the conspiracy was carried out in the manner just described to the extent of $60,000 being delivered in old $20 bills to Morrison by Rochester and Spain. The disputed evidence concerns whether Morrison actually bribed public officials with the money, or kept some part or all of it, or whether he did in fact use the $60,000 or some part thereof to bribe public officials and, if so, how much and to whom such bribes were paid.

Trial of defendants Northern Natural Gas Company and its subsidiaries, Northern Gas Products Company and Hydrocarbon Transportation, Inc., and two corporate officers, Delbert William Calvert and James C. Smith, began in Omaha, Nebraska on April 2, 1973.

After three days of trial the case was terminated by an agreement between counsel for the Government and counsel for said defendants. The three corporate defendants and James C. Smith were permitted to plead *nolo contendere* to one mail fraud charge and all other counts of the indictment against them were dismissed. All counts were dismissed against defendant Delbert William Calvert. All of these defendants agreed to cooperate with and to testify for the Government in the trial of all the other indicted defendants. Before the conspiracy indictment was returned some of the defendants died. Frank M. Rochester of the engineering firm died in April 1967. John J. Kavanagh, a permit engineer for the Cook County, Illinois Department of Highways, and James L. Dent, an East Chicago councilman, died. George C. Lamb, also a member of the City Council of East Chicago, committed suicide a few days after he was indicted.

Defendants Calvert and Smith testified at the Hammond trial of Nicosia. So did co-conspirators James R. Morrison and William L. Spain, who had been granted immunity. Earl Moldovan, who also was granted immunity, testified. They told of a complex scheme to bribe public officials with money which had been co-mingled with money intended for lawful purchases of rights of way, permits and licenses out of the R. G. M. & S. Escrow Account in the bank at Salem. As aforesaid, the money was paid out to Messrs. Rochester, Goodell, Moldovan and Spain upon receipt of vouchers for services which were in fact never rendered. Each of these individuals then accounted for the funds received in his Federal income tax returns and paid taxes thereon. The sizeable amount left over in the possession of each was then given to Rochester who in turn employed Morrison. It was Morrison who decided who should receive the money and when and where the payments should be made. Rochester did not even know the names of the persons who received payments. The names and the amounts paid were

known only to Morrison. Morrison simply called Rochester who either brought money as requested or sent it by Spain.

Morrison confessed in his testimony that Rochester and Spain turned over to him a total of $60,000 to deliver to public officials. Spain's testimony and the records of the deceased Rochester confirmed this. Rochester relied on Morrison to make the payments because of Morrison's long experience in the contracting business in the area involved and because of his long contact and intimate acquaintance with many of the public officials in Lake County, Indiana and Cook County, Illinois. Morrison had received $60,000 when Rochester died in April 1967 but he had not paid out all of it. He had approximately $40,000 from which he continued to make payments until, he said, the amount was exhausted in 1969.

Morrison testified in detail as to how, when and where and to whom he said he paid the money. Morrison said that in each case he told the public official to whom he gave money that he was making a political donation to him. Upon cross-examination he admitted that he did not report any of the $60,000 he received from Rochester and Spain as political contributions in accordance with Indiana law, although he did report a number of other political contributions of sizeable amounts he made during the same period of time in which he paid out the $60,000. He testified that he had been in the habit of making political contributions in Lake County, Indiana for many years.

The Government contends that all of the payments made out of the $60,000 fund which Morrison controlled were bribes paid out under the guise of political contributions.

After the Government traced the $60,000 to Morrison, an I.R.S. agent came to see him. The agent informed Morrison the Government had traced the $60,000 to him and knew he had paid no income tax on it. The agent informed Morrison the Government was conducting a criminal investigation of him. Morrison was informed of his right to refuse to make a statement by the agent. On cross-examination Morrison admitted that he then made no statement at that time. Thereafter he conferred with a lawyer who specialized in tax matters and he learned that if he could show that he merely acted as an agent and kept none of the $60,000 himself but delivered it as political contributions to third persons, he would not be liable for filing fraudulent income tax returns.

Morrison made a statement to the I. R.S. agent in which he stated he kept none of the $60,000 himself but gave it out to eight different persons in various sums, ranging from $500 to $9,500. Morrison then agreed to testify for the Government before the Grand Jury and at the trial of each person he named as receiving payments, and he did in fact testify before the Grand Jury and in this trial. In return for his testimony before the Grand Jury and in this case and other cases, he was not indicted and only named as an unindicted co-conspirator.

Morrison testified in this case that on September 30, 1966, after calling Nicosia earlier in the day, Nicosia came to Morrison's office at 9 P.M. and Morrison gave Nicosia $9,500 in old U.S. $20 bills in an ordinary-size envelope. Morrison further testified that on September 11, 1967, at dusk in the evening, he went to Nicosia's home and gave him $5,000 in old U.S. $20 bills.

On cross-examination, Morrison admitted that in an earlier statement given to the I.R.S agent he had stated under oath that Nicosia came to his office in the late afternoon of September 30, 1966 and not at 9 P.M. as he testified at the trial. He said his office kept a complete record of all persons who came to his office during business hours. He admitted that the log in his office shows no visit from Nicosia on the afternoon of September 30, 1966, though the log does show visits of East Chicago councilmen James L. Dent and George C. Lamb, both of whom he testified he

818

knew well and to whom he testified he gave part of the $60,000 about September 1966 and afterwards. He also testified he made other contributions to them.

Morrison's records were brought into court and he admitted that nowhere was there any notation concerning Nicosia, not even in the small notebook which he used to refresh his memory at the trial and in which, he said, he made pencilled notes indicating when, how much and to whom he paid out the money.

Although Morrison testified he gave Nicosia the first payment of $9,500 in an ordinary-size envelope, upon cross-examination defendant's counsel handed him an ordinary long size-envelope and $9,500 in cash and demonstrated that such an envelope could not contain $9,500 in $20 bills but that it took three such envelopes to contain the money.

When cross-examined about his visit on September 11, 1967 to Nicosia's home, Morrison became vague. He told a story of finding Nicosia alone doing a masonry job on his patio, which testimony was completely refuted by the testimony of the contractor who actually constructed the patio.

Defendant Nicosia testified on his own behalf. Nicosia's income tax returns show that he paid no income tax on either of the alleged payments to him. He testified that he paid no tax on these alleged payments because he did not receive them. Nicosia categorically denied that he visited Morrison in his office on September 30, 1966, or on any other occasion, or that Morrison had visited him in his home on September 11, 1967, or on any other occasion, or that Morrison had delivered $9,500 to him on September 30, 1966 or $5,000 on September 11, 1967, or that Morrison had delivered any sum of cash or money to him at any time. Nicosia testified that he had only met Morrison on one or two occasions at public affairs and had no political, social or personal relations with Morrison. Morrison's own testimony revealed that he had a very limited

acquaintanceship with Nicosia and that he never had any extensive conversations or dealings with Nicosia except on the two occasions when he claimed he made the contributions to Nicosia.

Nicosia's wife testified that she had never seen Morrison before the trial. She said she has not gone out of the Nicosia house of evenings and that she has not left her husband alone of evenings for at least 10 years, except for two Spring banquets each year, and that Morrison could not have visited Nicosia alone in the Nicosia home on September 11, 1967. Nicosia's secretary, during the time he was Mayor, testified that she screened all telephone calls for Nicosia while he was Mayor and that he never called Morrison and never had a call from him. She also served as receptionist and testified that Morrison never visited Nicosia in Nicosia's office.

Numerous witnesses testified not only concerning Nicosia's good reputation for truth and veracity but as to his reputation as a law-abiding citizen and concerning his activities in innumerable good causes without compensation. The evidence also showed that Dr. Nicosia's $15,000 annual salary as Mayor of East Chicago did not compensate him for the loss of income from seeing individual patients in his medical practice which he gave up during the time he served as Mayor.

The record revealed, but not before the jury, that one I.R.S. agent reported Nicosia did not live beyond his means. Another agent stated that he would have closed the investigation of Nicosia except that he was ordered not to do so, apparently because of a magazine article concerning alleged policy wheel operations in East Chicago. That evidence was not before the jury either.

Morrison testified that he graduated from college as an engineer more than a quarter of a century ago and that for more than 20 years he was engaged with his father and now with his son in the contracting business in Hammond. He has been president and general manager

of the construction firm for many years. He hires from 1,000 to 2,500 people annually and engages in large scale construction projects and deals in millions of dollars annually. Morrison is indeed an engaging personality and a successful "go-getter type" of business man. He is one knowledgeable in the affairs of the business world as such affairs are conducted both above and under the table.

During the time he had the $60,000 in his possession, Morrison admitted that his company was having severe financial difficulties and that he himself was having a drinking problem. One of the Internal Revenue agents who interviewed him told of one occasion when Morrison was too drunk for him and another agent to get any sense out of the interview. Morrison in his testimony admitted that on occasion he was "smashed", meaning drunk. Under all the circumstances, Morrison's testimony that without prior conversation or arrangements, directly or through liaison, he called up Nicosia and got him to come to Morrison's office where he gave him $9,500 in old U.S. $20 bills, taxes the belief of a reasonable person. The same is true of Morrison's story of the $5,000 contribution he said he made when he claims he visited the Nicosia home.

 Every defendant in a criminal case is presumed to be innocent until proven guilty beyond a reasonable doubt and no defendant is required to prove himself innocent. In the case at bar the sole evidence against defendant Nicosia is the uncorroborated testimony of Morrison who said that at 9 P.M. on September 30, 1966 he gave Nicosia $9,500 in old $20 bills in Morrison's office, after calling Nicosia earlier in the day, and that on September 11, 1967 at dusk in the evening he went to Nicosia's home and gave him $5,000 in old $20 bills.

The court has considered the evidence against defendant in the light most favorable to the Government. The testimony of Morrison is unsupported. He was an alleged accomplice, named as a co-conspirator in the conspiracy indictment. Before this court he has admitted that part of his business is the making of political contributions on a wholesale basis in exchange for favors, which amounts to bribery under the guise of political contributions. His testimony about payments to Nicosia is contradicted by the surrounding circumstances and is impeached by his own sworn contradictory statements to the Internal Revenue agent when first interviewed. In this case the sole evidence as to Nicosia's receipt of payments is the testimony of Morrison, an alleged accomplice and self-confessed giver of bribes.

In Morrison's testimony he entirely absolved himself and shifted all the incriminating conduct to Nicosia. This is flatly and completely contradicted by defendant Nicosia who was shown by uncontradicted evidence to be a person of excellent reputation and to be a public official who never accepted political contributions. Such affirmative evidence, together with the evidence of defendant's lifetime of good works and excellent reputation, refutes the uncorroborated and impeached testimony of the Government's lone witness against defendant as to the alleged payments. Morrison would be guilty of defrauding the United States of income taxes by his own testimony except for his testimony against the defendant.

 The evidence produced by the Government does not constitute proof beyond a reasonable doubt that would satisfy a reasonable man as is required by the Constitution. That is the law of the land as announced in the decisions hereinafter cited.

The duty of a trial judge when a motion is made for a judgment of acquittal in a criminal case, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, was clearly set forth by the Court of Appeals for the Seventh Circuit in the case of United States v. Yeoman-

Henderson, Inc., 193 F.2d 867, 869. There the court in 1952 stated:

> When a motion for a judgment of acquittal is made, the sole duty of the trial judge is to determine whether substantial evidence, taken in the light most favorable to the government, tends to show the defendant is guilty beyond a reasonable doubt. . . .

The court there cited with approval similar language in Bell v. United States, 185 F.2d 302 (4th Cir. 1950). In 1954 the Court of Appeals for the Seventh Circuit in affirming this court in United States v. Aman, 210 F.2d 344, repeated its language verbatim as set forth in United States v. Yeoman-Henderson, Inc., *supra*. Other cases supporting this view are United States v. Thayer, 7 Cir., 209 F.2d 534; United States v. Bardin, 224 F.2d 255; United States v. Morris, 225 F.2d 91; United States v. Marshall, 266 F.2d 92; United States v. Taylor, 266 F.2d 310; United States v. Williams, 311 F.2d 721; and United States v. Eley, 314 F.2d 127.

The leading case on the whole scope of the motion for a judgment of acquittal is Curley v. United States, 81 U.S.App. D.C. 389, 160 F.2d 229, 232 (1947), cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). In that case the Court of Appeals for the District of Columbia stated:

> The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; . . .

In *Yeoman-Hunderson, supra,* Judge Duffy, speaking for the Court of Appeals for the Seventh Circuit in 1952, approved the language in the following words, ". . . The rule is well stated in Curley v. United States . . ." The *Curley* decision has been followed in the following cases: Cooper v. United States, 94 U.S.App.D.C. 343, 218 F.2d 39 (1954); Bates v. United States, 95 U.S. App.D.C. 57, 219 F.2d 30 (1955); Borum v. United States, 127 U.S.App.D.C. 48, 380 F.2d 595 (1967). In this last case the court, as if to emphasize the rule, in note 5 on page 596 in referring to the motion for acquittal says, "The motion must be granted 'if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt * * * '." Other cases are: United States v. Haderlein, D.C., 118 F.Supp. 346; Lyda v. United States, 9 Cir., 321 F.2d 788; Tillery v. United States, 5 Cir., 411 F.2d 644; United States v. Hibler, 9 Cir., 463 F.2d 455.

There are no cases contrary to the views set forth in these cases. Therefore it is well settled in American jurisprudence.

If there ever was a case in which there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, it is in the case at bar.

Accordingly, the court does hereby grant the motion of defendant for a judgment of acquittal, and inasmuch as the jury verdict of guilty rendered herein is not supported by proof of guilt beyond a reasonable doubt, the verdict of the jury finding Nicosia guilty as charged in Counts II and III, the income tax counts, is hereby vacated, set aside and declared null and void.

A judgment of acquittal of Dr. John B. Nicosia is hereby entered and he is hereby discharged from custody and acquitted of all charges for which he was indicted herein.