**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Phillip E. GALLOWAY,
Defendant-Appellee.**

No. 81–1693.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 16, 1981.

Decided Nov. 17, 1981.
Rehearing and Rehearing In Banc
Denied Dec. 22, 1981.

John A. Franke, U. S. Atty., Madison, Wis., for plaintiff-appellant.

William J. Vaxley, Charles A. Dauphin, Birmingham, Ala., for defendant-appellee.

Before SWYGERT, Senior Circuit Judge, and SPRECHER and CUDAHY, Circuit Judges.

SPRECHER, Circuit Judge.

This case involves the application of the federal mail fraud statute, 18 U.S.C. § 1341 (1980), to a scheme to defraud automobile purchasers by "rolling back" automobile odometers. Following a jury verdict of guilty, the trial court directed a verdict for the defendant. Because we find that the jury properly could have found that this

scheme falls within the strictures of the federal statute, we reverse the trial court's ruling.

## I

Defendant Galloway is an Alabama wholesaler of used automobiles. On February 11, 1981, an indictment was returned alleging that Galloway had engaged in a scheme to defraud Wisconsin automobile purchasers by altering the odometer readings on used cars and then selling those automobiles to retailers. This indictment relied on the third prohibited act of the mail fraud statute, which makes it a crime to "knowingly [cause matter] to be delivered by mail [in furtherance of a fraudulent scheme]," [1] and alleged six specific mailings.

The evidence at trial established odometer rollbacks on thirteen automobiles purchased by Wisconsin residents from retail dealers. All these automobiles had been sold to retail dealers by Galloway, primarily through the Greater Chicago Auto Auction, although a few had been sold directly to a dealer whom Galloway had come to know personally. The Wisconsin dealers would ship or drive the automobiles to Wisconsin, where they were eventually sold to retail customers. In order to finalize this purchase, the Wisconsin dealer would apply for title on behalf of the retail purchaser by mailing the required documents to the State Department of Transportation. These title applications constituted the requisite mailings which supported the mail fraud indictment.

The trial court found that the jury had sufficient evidence to find that Galloway had formulated and carried out a scheme to defraud. The evidence showed that the scheme resulted in the automobile dealer, and ultimately the retail customer, paying a higher price for these automobiles than their actual market value.

The trial court also found that the jury had sufficient evidence from which it could find that Galloway "caused" the mailing of title applications by Wisconsin dealers, in that he "could reasonably have foreseen that the mails would be used in the course of transferring physical possession and title of the cars to retail customers." *United States v. Galloway*, No. 80–CR–55, slip op. at 3 (W.D.Wis. March 31, 1981).

The court ruled, however, that the jury did not have sufficient evidence from which to find that the use of the mails was "for the purpose of executing" Galloway's scheme to defraud. *Id.* The court found that the mailings alleged did nothing to further Galloway's scheme of obtaining more money for the cars, since the transfer of title accomplished by the mailings would have occurred at whatever price the automobiles were sold. Galloway's scheme, the court found, "was complete for his purposes when the retail customer agreed to the selling price and took physical possession of the car." *Id.* at 4. The mailings, therefore, occurred "chronologically after the scheme had reached fruition; ... [and] did nothing to affect the price paid for the car or to conceal the alteration of the odometer." *Id.* at 8. Thus, the court directed a verdict for Galloway following the jury's guilty verdict.

## II

### A

■ The starting point for analysis of a conviction under the mail fraud statute is

1.  18 U.S.C. § 1341 (1980) states:

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

determining the scope of the alleged scheme. The district court accepted the government's contention that Galloway's scheme was an attempt to defraud Wisconsin retail purchasers, who based their decision to purchase the automobiles upon the altered odometers. The evidence at trial indicated that the higher wholesale cost of automobiles resulting from the odometer tampering was reflected in higher prices at the retail level. Thus, the victim of this fraud was the retail customer. Furthermore, retail purchasers were "crucial to defendant's ability to continue the scheme." *Id.* at 6. While Galloway on appeal contends that this is an overly broad reading of the scope of the scheme, we find that the jury had sufficient evidence from which it could conclude, as the court below noted, "that the defendant's scheme was not complete until the cars had been resold to retail customers in Wisconsin." *Id.*

Having determined the scope of the scheme, we turn to an examination of the applicability of the mail fraud statute to the scheme.[2] This examination demonstrates that the mailing of title documents satisfies the requirements of the statute.

While the statute requires that the mailing occur "for the purpose of executing the scheme" to defraud, *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954), the courts have given a broad interpretation to this phrase, and have held that mailings "in furtherance" of the scheme meet the statute's jurisdictional requirement. *United States v. Keane*, 522 F.2d 534, 544 (7th Cir. 1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). Thus, in *Ohrynowicz v. United States*, 542 F.2d 715 (7th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 650, 50 L.Ed.2d 630 (1976), this court applied the mail fraud

statute to a "check-kiting" scheme in which the defendant utilized the temporary, non-personalized checks provided by banks upon opening a new account to defraud several banks. The mailing upon which the mail fraud conviction rested, however, was the mailing to the defendant of personalized checks ordered when the accounts were opened, but never used by the defendant.

The court found that the mailings were "for the purpose of executing" the scheme to defraud. It noted that while the personalized checks were never used, the ordering of such checks "was a normal part" of opening an account, thus "leading to the conclusion that the order was in furtherance of the fraudulent scheme." *Id.* at 718. *Ohrynowicz* has been interpreted to hold that where a mailing was a "normal concomitant of a transaction that was essential to the fraudulent scheme, [the mailing] was made for the purpose of executing that scheme." *United States v. Clark*, 649 F.2d 534 at 542 (7th Cir. 1981); *United States v. Lea*, 618 F.2d 426, 430 (7th Cir.), *cert. denied*, 449 U.S. 823, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980).

The application of the court's holding in *Ohrynowicz* to the facts in the instant case clearly demonstrates that the requirements of the mail fraud statute are satisfied. Here the final step in the scheme, as found by the district court, was the retail sale of automobiles. This essential transaction was not complete until the title documents were mailed to the responsible state agency, which then transferred title from the dealer to the retail purchaser. These mailings were thus *more* than "normal concomitants" of an essential transaction, they were an integral part of that transaction. They were essential to executing the scheme to defraud.[3] *See also United States*

---

**2.** In defining the scope of the scheme in this manner, we do not imply that it was not of a continuing nature. As our discussion in Part II–B *infra* notes, defining the scheme here as ongoing provides further support for application of the mail fraud statute in this case.

**3.** The court below distinguished *Ohrynowicz*, as well as other Seventh Circuit cases applying the mail fraud statute, on the grounds that there the mailings occurred chronologically af-

ter the "fruition" of the scheme to defraud. Here, however, the scheme was not in fact completed until a retail sale was made, and the mailings were necessary to complete the sale. The fact that Galloway received his money before these mailings does not change our conclusion, for "a fraudulent scheme may depend on a mailing even after the defrauders have received the sought-after money or documents." *United States v. Kent*, 608 F.2d 542, 546 (5th

*v. Kent*, 608 F.2d 542, 546 (5th Cir. 1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980) ("The requisite statutory purpose exists if the alleged scheme's completion could be found to have been dependent in some way upon information and documents passed through the mails").

The application of the mail fraud statute to a similar fact situation was upheld by the Fifth Circuit in *United States v. Shryock*, 537 F.2d 207 (5th Cir.), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1976). There, the court upheld a mail fraud conviction stemming from a scheme to alter odometer readings on used automobiles and resell the autos to retail purchasers. At the time of the sale the dealer would hand-deliver title applications and mileage certificates to a local division of the State Motor Vehicle Department, which then mailed these documents to its office in the state capital. Noting that "[t]he transfer of title is a necessary step in the sales transaction which was not actually completed until the title papers passed," the court found these intra-governmental mailings to have been in furtherance of a scheme to defraud. *Id.* at 209. While the documents in *Shryock* included an indication of the odometer reading, this alone did not further the defendant's scheme, and indeed may have endangered the scheme. *See United States v. Maze*, 414 U.S. 395, 403, 94 S.Ct. 645, 650, 38 L.Ed.2d 603 (1974) (no mail fraud statute liability where mailings increased the probability that the fraudulent scheme would be detected). Nor does the fact that *Shryock* involved the direct sale of automobiles to retail purchasers distinguish it from this case. Both schemes had as their ultimate objective a sale to a retail customer. The interposition of a wholesale buyer in this case does not change the role

that transfer of title plays in completing the scheme. Thus, *Shryock* stands for the proposition that where a sale to a retail customer is the final object of a scheme to defraud, mailings of title documents necessary to complete the sale are made "for the purpose of executing" the scheme.[4]

## B

Our analysis to this point has not dealt with the continuing nature of Galloway's scheme. An examination of this aspect of the scheme provides further support for the conclusion that Galloway's conduct is properly punishable under the mail fraud statute.

Although the district court did not discuss it, a major emphasis of the government, in both the indictment and at trial, was the ongoing character of Galloway's scheme. Thus, for example, evidence was introduced of odometer rollbacks on automobiles that were not subjects of the indictment, in order to demonstrate that Galloway's scheme extended beyond individual sales. Furthermore, the amount of profit realized by Galloway on each individual sale could well have caused the jury to conclude that Galloway's scheme was of the ongoing nature alleged in the indictment.

The ongoing nature of the scheme, therefore, required a *continuing* access to retail dealers, principally through the Greater Chicago Auto Auction. This access, in turn, depended upon the retailers' experiences in profitably selling automobiles obtained from Galloway. In order to sell his cars at the auction, it was necessary for Galloway to provide the dealer-purchasers, through the auction, with the necessary title documents. In order for the dealer-purchasers to then sell these cars, it was necessary for

Cir. 1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980).

**4.** *Shryock* also demonstrates the fallacy in Galloway's argument that the mailings in this case were "routine business mailings," and therefore exempt from mail fraud strictures under *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), and related cases. The mailings in *Shryock* were legally required,

yet the court found the mail fraud statute to be applicable nevertheless. The mailings in *Parr* were totally unrelated to, and indeed predated, the scheme. Here, however, as in *Shryock*, the mailings were inexorably tied to an essential step in the scheme. *See United States v. Feinberg*, 535 F.2d 1004, 1009 (7th Cir.), *cert. denied*, 429 U.S. 929, 97 S.Ct. 337, 50 L.Ed.2d 300 (1976).

them to transfer title by mailing these title documents to the appropriate state agency. Only the experience of successful title transfer, therefore, would induce the dealer to return to the auction and purchase other automobiles from Galloway. Any failure in the title application process would have endangered Galloway's scheme by discouraging the retail dealer from making further purchases of his automobiles. Furthermore, the evidence at trial suggested that those attending the auction frequently knew and spoke with each other. From this, the jury could conclude that the effect of a failure in the title application process would be to discourage purchases among a host of dealers.[5]

Thus, the title application procedure, from Galloway's provision of the title documents to their mailing to the state agency,[6] was an essential step in Galloway's scheme. The success of this step ensured his continued ability to reap the profits of his odometer tampering.

### C

Galloway argues that the Supreme Court's decision in *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), precludes his liability under the mail fraud statute. The facts in the two cases, however, are readily distinguishable. In *Maze* the defendant had been convicted on four counts of mail fraud arising from his theft and use of a "Bank Americard" credit card. The alleged violation of the mail fraud statute stemmed from the fact that, in using the card, the defendant "knew that each merchant would cause the sales slips of the purchases to be delivered by mail to the Louisville bank which would in turn mail them to [the cardholder] for payment." *Id.*

at 397, 94 S.Ct. at 647. The Court found that these facts failed to demonstrate a violation of the mail fraud statute.

The Court emphasized that the statute, although it has been read broadly, nevertheless requires that the requisite mailings be " 'for the purpose of executing the scheme.' " *Id.* at 400, 94 S.Ct. at 648, quoting *Kann v. United States*, 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944). In *Maze*, however, the mailings were "directed to the end of adjusting accounts" between the various victims of Maze's scheme. 414 U.S. at 402, 94 S.Ct. at 649. The Court noted that "there is no indication that the success of this scheme depended in any way on which of his victims ultimately bore the loss." *Id.* Indeed, the Court emphasized, these mailings *endangered* Maze's scheme, by furthering the likelihood of detection. *Id.* at 403, 94 S.Ct. at 650. Given this fact, the mailings could not fairly be said to have been in furtherance of the scheme.

Here, on the other hand, the evidence demonstrated that these mailings were necessary to complete the retail sale which was the final object of the scheme, as well as to ensure the ongoing success of the scheme. While it is true, as the trial court noted, that failure to pass title would not necessarily have resulted in discovery of the scheme, it would have endangered its continued success. Certainly the mailings were not *counterproductive* to the scheme, as were the mailings in *Maze*.[7] In this case, therefore, the mailings may fairly be said to have been for the purpose of executing the scheme to defraud.

### III

We conclude that Galloway's scheme to defraud falls within the prohibitions of 18

---

5. While the sale of automobiles occurred through the auction, there was, as the court below noted, substantial evidence from which the jury could conclude that problems in the title application process of Galloway's cars could be traced to him.

6. As the district court noted, the evidence supported the finding that Galloway caused the mailings at issue, in the sense that he could reasonably have foreseen their occurrence.

This, of course, is the only causation required by the mail fraud statute. *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954).

7. Galloway admits this fact by emphasizing that nowhere on the title document is an odometer reading required. Such a requirement, of course, might have made detection of the scheme more likely.

U.S.C. § 1341 (1980). Therefore, the district court's judgment of March 31, 1981, is Reversed, and the cause is Remanded with directions that the district court reinstate the jury verdict of March 13, 1981.

CUDAHY, Circuit Judge, concurring:

With the mail fraud statute we are writing on anything but a clean slate. Although the present case takes us to what (for now) may be the outer limits, our result, as Judge Sprecher has ably demonstrated, does no real violence to the precedents. I am sensitive to Judge Swygert's keenly articulated concern that the connection between Galloway and the mailings is quite attenuated. In my view, however, the link is not so tenuous as to avoid the judicially hypertrophied reach of this far-ranging statute.

SWYGERT, Senior Circuit Judge, dissenting.

I respectfully dissent because I do not believe that the mailings in this case furthered, in any way, the scheme to defraud. In reaching the opposite conclusion, the majority has completely misinterpreted *Ohrynowicz v. United States*, 542 F.2d 715 (7th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 650, 50 L.Ed.2d 630 (1976), and has failed to distinguish *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), on anything but a superficial basis.

The majority has interpreted *Ohrynowicz* to hold that where a mailing is a "normal concomitant of a transaction that was essential to the fraudulent scheme, [the mailing] was made for the purpose of executing that scheme." Maj. op. at 163. *Ohrynowicz* does not stand for the proposition that *every* mailing which is a normal concomitant of an essential transaction provides the

requisite jurisdictional basis for a mail fraud conviction. Any other interpretation is inconsistent with *Maze v. United States*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). In *Maze*, the defendant stole a credit card and used it to charge food and lodging at several motels. The invoices mailed from the motels to the bank which issued the credit card were certainly a normal concomitant of the credit card transaction, yet the Supreme Court affirmed the acquittal of the defendants on the mail fraud charge because these mailings did not further the scheme. Thus determining that a mailing is a normal concomitant of an essential transaction is only the beginning of the inquiry. I agree that the mailings in this appeal are a normal concomitant of the retail sale of the car. Nevertheless, they did not further the scheme. They did not affect the price paid for the car, conceal the alteration of the odometer, cause any benefits to flow to Galloway, or cause any further harm to the retail purchasers of the car.

In *Ohrynowicz* and *United States v. Clark* (also cited by the majority), this court found the mailings to be "normal concomitants," but was also careful to point out how the mailings furthered the scheme. In the instant case, the majority has concluded that the mailings were "more than normal concomitants" without establishing the factual basis for its conclusion.[1] According to the majority, the retail sale was an essential transaction, the transfer of title was necessary to complete the retail sale and the mailing was a means of executing the transfer to title. It must be remembered that Galloway had nothing to do with the cars after he delivered them to the Auction. Thus, these mailings were only a convenient means of effecting a transaction to which Galloway was not a party.[2] The connection

1. The majority claims that the mailings were an "integral part" of an essential transaction. Given that the retail sale was an essential transaction, it does not follow that the mailing was an integral part of that transaction. The transfer of title may be an integral part of a retail transaction but this occurs at the Department of Motor Vehicles. The mailing was just a convenient procedure for moving the docu-

ments from the dealer to the Department of Motor Vehicles. The mailing itself did not produce the transfer of title. It was simply a normal concomitant of the retail sale.

2. Where the mailings in a mail fraud scheme arise from a transaction in which the party perpetrating the fraud does not participate, I believe that the courts should be very careful to

between Galloway and the mailings is too attenuated to fall within the ambit of the mail fraud statute.[3] A review of *Maze* and other cases supports this conclusion.

The majority has narrowed the holding in *Maze* to one sentence: there is no mail fraud liability where the mailings increased the probability that the fraudulent scheme would be detected. *Maze* does not stand for this proposition. *Maze* said that the mailings involved did not further a scheme to defraud in a specific fact situation. The fact that the mailings increased the likelihood of detection was only evidence that they did not further the scheme; it was not the crux of the holding. Any other conclusion ignores the fact that many mailings may both further the scheme *and* increase the likelihood of detection.[4] Given this, it must be determined whether the facts in *Maze* are analogous to the facts in this appeal. I believe that they are. In both cases, the transactions from which the mailings arose were essential to the completion of the scheme. In both cases, the mailings were a normal concomitant of the essential transaction. In *Maze*, the mailings were directed to the end of adjusting accounts among the victims of the defendant's scheme. In this appeal, the mailings were used to bring about the transfer of title between the victims of Galloway's scheme.

In *Maze*, the scheme did not depend on who bore the loss; here, the success of the scheme did not depend on how the transfer of title was completed. In *Maze*, whomever ended up with the invoice bore the loss. In this case, whomever ends up with title bears the loss. I fail to see any valid distinction between the facts in this case and in *Maze*. Despite all these similarities, the majority focuses on the one difference between the two cases and dismisses *Maze* as precedent. As pointed out above, this solitary distinction was not essential to the holding in *Maze*.

*Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), is also analogous. In *Kann*, corporate officers and directors were accused of diverting profits from their own corporation to a dummy corporation. As part of the scheme, the defendants obtained checks payable to them which were cashed or deposited at a bank and then mailed for collection to the drawee bank. The Supreme Court held that the fraud was completed at the point at which defendant cashed the checks:

> The scheme in each case had reached fruition. The persons intended to receive the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank

clearly establish the connection between the mailing and the defendant. *See United States v. Lea*, 618 F.2d 426, 432 (7th Cir. 1980) (Cudahy, J., *dissenting*).

**3.** If the cars had been sold from one dealer to another before being sold to a retail customer, the mailing would have been even further removed from Galloway, as the Department of Motor Vehicles does not register transfers of title between dealers. I do not believe that the majority would have any trouble concluding that the mailing in this hypothetical case would be too attenuated to provide the basis for a mail fraud conviction. Unless the majority is prepared to agree that both fact situations (the hypothetical and the instant case) fall within the reach of the statute, we have a situation where the defendant's involvement is identical in both cases and yet one is mail fraud, the other is not.

This hypothetical is by no means improbable. In fact, of the thirteen cars with rolled-back odometers, one was sold at the Chicago Auction to a dealer who subsequently sold it to a

third dealer. Galloway was not convicted for mail fraud with respect to this automobile. (Only six of the thirteen transactions were included in the indictment.)

Also, if the dealers had sold the cars to out of state consumers, no mailing would have occurred. Where a mail fraud conviction hangs so precariously on the actions of a nondefendant, I believe the courts should view this as evidence of the attenuation between the mailing and the defendant.

**4.** This is exactly what happened in *Ohrynowicz*. 542 F.2d at 718. The mailings increased the likelihood of detection but also helped to temporarily conceal the illegal nature of the scheme. The court concluded that these mailings furthered the scheme, after a discussion of *Maze*. Thus a finding that a mailing increases the possibility of detection is only a factor to be weighed with all the other facts; it is not determinative of whether *Maze* applies in a given case.

which paid or credited the check would collect from the drawee bank. It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires. 323 U.S., at 94, 65 S.Ct. at 151.

As in *Kann*, Galloway had irrevocably received the money from the fraud. It was immaterial to him how the title to the car was transferred from the dealer to the consumer.

I also find the *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), line of cases helpful in determining whether the mailings in this case are sufficiently related to the fraudulent scheme. (Although the majority touches on *Parr*, it has ignored *Parr*'s progeny, *United States v. Tarnopol*, 561 F.2d 466 (3d Cir. 1977).) In *Parr*, the Supreme Court held that intrinsically innocent routine mailings required by law did not further a scheme even when they occurred during the course of the scheme. In *United States v. Tarnopol*, 561 F.2d 466 (3d Cir. 1977), the Third Circuit reasoning from *Parr* decided that there is no

> valid distinction to be drawn between those routine mailings which are required by law and those routine mailings, themselves intrinsically innocent, which are regularly employed to carry out a necessary or convenient procedure of a legitimate business enterprise. In either case the mailings themselves are not sufficiently closely related to the fraudulent

scheme to support a mail fraud prosecution.

561 F.2d at 472. The mailings in this appeal fall within the parameters of this reasoning. The transfer of the automobile titles through the post office was a routine mailing performed by Wisconsin dealers as a service to their customers. The dealers are legitimate business enterprises and the mailings were intrinsically innocent and used to carry out a convenient procedure of the dealership.[5]

The majority has also advanced the argument that the mailings in issue furthered the scheme because successful title transfer helped ensure Galloway's good will among Wisconsin dealers thus facilitating his ability to sell more cars at the Chicago Auction. The mailings, however, did no more to ensure Galloway's access to the Chicago Auction than the mailings in *Kann, supra*, did to ensure the defendants' access to bank services or the mailings in *Maze, supra*, did to further the defendant's access to the motel market.[6]

At this point I find it necessary to distinguish *United States v. Shryock*, 537 F.2d 207 (5th Cir.), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1976). *Shryock* also involved a scheme to roll back odometers but in that case, the roll back and the mailings were caused by a retail dealer. The mailings contained a falsified statement of the odometer reading. The *Shryock* mailings thus furthered the scheme by helping to cover up the true odometer reading. In the instant case, the mailings

---

**5.** The majority has dismissed the routine business mailing argument claiming that the mailings in *United States v. Shryock*, 537 F.2d 207 (5th Cir.), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1976), were necessitated by law but were still within the purview of the mail fraud statute. This is patently wrong. The mailings in *Shryock* were not necessitated by law; the law only required that a form containing an odometer statement accompany the application for transfer of title. The law did not specify how the form was to be delivered. The correct case for determining the legal impact of a mailing of this type is *United States v. Tarnopol*, 561 F.2d 466 (3d Cir. 1977).

**6.** The contention that title transfer is necessary to ensure Galloway's access to the Chicago

Auction ignores the realities of this market, and Galloway's interaction in it. There are 4,800 dealer-buyers registered at the Auction and during the eighteen months pertinent to the indictment, Galloway sold 756 cars at the Auction. If title were to fail on one of Galloway's cars, it is unreasonable to conclude that 4,800 dealer-buyers would blacklist all his cars. The majority's conclusion that Galloway relied on Wisconsin dealers to return to the Auction to purchase more of his cars is refuted by these facts. Galloway did not know who would buy his cars. How could he rely on them to return to the Auction? Further, the evidence also is clear that Galloway sold used cars at other auctions throughout the United States.

did not contain an odometer reading and they involved a transaction to which Galloway was not a party. In applying *Shryock*, the majority has failed to recognize that where a defendant is not involved in a transaction, a mailing which results from that transaction is more remote from the defendant than if he was involved in the transaction.

In conclusion, I believe the mailings were not "sufficiently closely related to respondent's scheme to bring his conduct within the statute." *United States v. Maze, supra*, 414 U.S. at 399, 94 S.Ct. at 648. The mailings did not conceal the fraud, produce profit for Galloway or contribute to the consumer's harm. The mailings resulted from a transaction to which Galloway was not a party and they were routine business mailings the purposes of which were immaterial to Galloway.

For the above reasons, I respectfully dissent.