**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James FALLON, Defendant-Appellant.**

**No. 85–1158.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1985.

Decided Nov. 4, 1985.

Jeffrey A. Kaufman, Gimbel, Gimbel & Reilly, Milwaukee, Wis., for defendant-appellant.

Nathan A. Fishbach, Asst. U.S. Atty., Office, Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, and BAUER and FLAUM, Circuit Judges.

BAUER, Circuit Judge.

The defendant, James Fallon, was convicted below on nine counts of aiding and abetting mail fraud in violation of 18 U.S.C. § 1341 and on one count of conspiracy to alter motor vehicle odometers in violation of 15 U.S.C. § 1986. Fallon appeals his conviction on four of the nine mail fraud counts on the basis that the conduct alleged in those counts does not constitute a violation of the mail fraud statute. Fallon also attacks his conviction on all counts arguing that the jury was prejudiced by subsequently stricken testimony of a key witness who had a "performance deal" with the prosecutor. Fallon contends that despite the judge's instructions the jury must have considered the stricken testimony because the remaining evidence was insufficient to support his conviction. We affirm.

## I.

Defendant Fallon was employed by Suburban Auto Brokers ("SAB"), an Illinois business organization. SAB was engaged in the business of buying used cars from automobile dealerships and then reselling those cars either to other dealerships or to the public.

SAB was also engaged in an on-going fraud. The government demonstrated at trial that, after purchase and before resale of a car, SAB often "rolled back" the car's odometer altering it to indicate a mileage reading substantially lower than the actual miles the car had been driven. To complete the fraud, SAB obtained a new vehicle title which, unlike the old title, did not indicate an odometer reading at the time of transfer. SAB could then enter whatever mileage it wished on the title before reselling the car.

SAB had to obtain new titles for its cars because the usual method of title assignment would reveal a car's true mileage when SAB resold the car. When SAB purchased a car from a dealer, the dealer usually assigned title by signing the vehicle title on the back and entering the odometer reading in the appropriate blank. SAB could not simply reassign a car with a rolled back odometer using this title since it showed the car's true pre-roll back mileage.

SAB obtained new titles without odometer entries by utilizing the Wisconsin Department of Transportation's auto titling process. A SAB employee would submit an application for new vehicle title along with the car's old transferred title to the Driver's License Exam Station in Elkhart, Wisconsin. The Exam Station would issue a new title with no odometer reading entry in the name of "Suburban Auto Brokers." The Exam Station then forwarded SAB's application and accompanying documents by United States mail to the Wisconsin Department of Transportation ("WDOT") in Madison, Wisconsin.

When SAB subsequently sold the vehicle, it simply entered whatever mileage it desired on the blank title. Although dealers can "sign over" title when selling a car to another dealer, consumers purchasing cars from dealers are required to apply for new titles. Thus, WDOT eventually received a record of all SAB purchases and resales.

SAB's procedure of routinely obtaining new vehicle titles in its own name was not necessarily suspicious. Evidence at trial indicated that this is a relatively common practice among auto brokers who sell cars to dealers. Auto brokers protect the identity of their sources so that purchasers cannot bypass the broker and go directly to the source.

SAB's plan was thus unlikely to attract special attention from WDOT. It could only be detected if WDOT matched the title from a SAB purchase to the title from a

SAB sale, checked the information contained in both, and noticed the discrepancy between the odometer entries. Although WDOT checks every title application to make sure proper documents exist for each one, verification of the information contained in title documents is done only on a "spot check" basis.

The government presented evidence at trial of defendant Fallon's personal involvement in SAB's scheme. The government presented numerous vehicle titles, reassignment supplements, and odometer statements signed by Fallon which indicated that Fallon, on behalf of SAB, purchased many cars with high mileage readings and resold them with lower mileage readings. Several witnesses who were "drivers" for SAB testified that following Fallon's instructions they picked up several cars from dealers who had sold the cars to SAB, and later delivered the same cars to dealers who had purchased the cars from SAB. These witnesses testified that many of the cars had higher mileage readings on their odometers when purchased than when sold. Another government witness testified that he and Fallon had discussed altering odometer entries on vehicle titles by adding a decimal point before the last digit of the existing odometer entry and then adding a digit at the beginning of the odometer entry. For example, an entry showing that a car had 62000 miles at time of transfer could be modified by this method to show 36200.0 miles.

The government also presented the testimony of another SAB employee, Richard Huebner, an indicted co-conspirator who pled guilty prior to trial. On Fallon's motion the district court judge later struck Huebner's testimony on the ground that Huebner had made a "performance deal" with the government; as the district court phrased it, "it would be Huebner's performance at trial which would be the determining factor in whether he would be prosecuted." No. 84–CR–55, Mem.Op. at p. 7 (Dec. 7, 1984). Immediately after striking Huebner's testimony, the court instructed the jury to disregard the testimony. The court gave this instruction again when instructing the jury generally. Huebner was the only witness to testify that Fallon directed him to roll back odometers, saw him perform the work, and paid him for it.

Following the jury's verdict of guilty as to ten counts, Fallon moved for judgment of acquittal as to four mail fraud counts on the grounds that the mailings involved did not constitute mail fraud. Fallon also moved for a mistrial on the grounds that the jury must have improperly considered the excluded testimony of Richard Huebner because the remaining evidence was insufficient to convict Fallon of conspiracy to alter vehicle odometers or of aiding and abetting mail fraud. The trial court denied all post-conviction motions and entered the judgment and conviction order on January 18, 1985. Fallon was sentenced to fifteen months imprisonment for each mail fraud conviction, the sentences to run concurrently. For his conviction for conspiracy to alter vehicle odometers, Fallon was placed on probation for five years during which time he was ordered to refrain from engaging in the auto sales business. In addition, Fallon was ordered to make restitution totalling six thousand dollars. This appeal followed.

II.

To convict a defendant of mail fraud under § 1341, the government must prove that the mailings were "for the purpose of executing the scheme." *United States v. Maze,* 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974); *United States v. Bonansinga,* 773 F.2d 166, 168 (7th Cir. 1985); *United States v. Wormick,* 709 F.2d 454, 462 (7th Cir.1983). Fallon contends that the mailings of vehicle title application documents from the Driver's License Exam Station in Elkhart, Wisconsin to WDOT in Madison, Wisconsin were not "for the purpose of executing the scheme" because the mailings "were neither essential to nor in furtherance of the alleged odometer roll back scheme."

Fallon argues that the mailings were not "in furtherance of" the scheme because the

Exam Station entered the relevant vehicle titling information in WDOT's computer when SAB applied for title. The Exam Station issued SAB its new blank title immediately and often waited days before mailing the underlying documents to WDOT. From this, Fallon concludes that the document mailings were unnecessary to obtain title. He argues they were instead made for "mere" record-keeping purposes.

Fallon argues that the mailings were not "essential to" the scheme because SAB was indifferent as to whether or not an individual mailing was even made. Fallon points out that when WDOT discovers that a document is missing it does not begin an investigative search; WDOT simply creates a "dummy" document containing as much information as is known of the missing document's contents. Fallon claims that SAB's scheme would thus be unaffected by the Exam Station occasionally failing to mail a set of titling documents. He concludes that the mailings were not "essential to" and thus not "for the purpose of" executing the scheme.

Finally, Fallon claims that the mailings actually increased the likelihood of SAB's scheme being detected and that under the relevant case law such mailings cannot constitute mail fraud. Specifically Fallon directs us to the Supreme Court's decision in *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), and our own decision in *United States v. Galloway*, 664 F.2d 161 (7th Cir.1981), *cert. denied*, 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982).

This case is controlled by *United States v. Galloway*, 664 F.2d 161 (7th Cir.1981), *cert. denied*, 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982). In *Galloway*, the defendant was an automobile wholesaler who, like Fallon, rolled back the odometers of used cars that he sold to dealers. Galloway, like Fallon, was convicted of mail fraud. The mailings triggering the mail fraud statute in *Galloway* were, as here, mailings to WDOT of vehicle title applications. In *Galloway*, however, the title ap-

plications were mailed directly to WDOT by purchasing dealers in order to transfer title to the ultimate consumers to whom cars were resold. We concluded in *Galloway* that these mailings by purchasing dealers were sufficiently "for the purpose of" the defendant-wholesaler's scheme to invoke liability for mail fraud.

The mailings at issue here are in some ways more closely connected to SAB's scheme than the *Galloway* mailings were to Galloway's scheme. SAB's mailings were necessary to obtain a prerequisite of its scheme, an alterable title in SAB's own name; Galloway's mailings were necessary only to complete a second sale to a public consumer, one step removed from and well after the first fraudulent sale from Galloway to the dealers. SAB's mailings were necessary to complete each and every fraudulent sale; the *Galloway* mailings only occurred if the purchasing dealer resold the car to a public consumer. Moreover, SAB dealt directly with WDOT; in *Galloway*, purchasing dealers who were unaware of Galloway's scheme dealt with WDOT.

SAB's mailings are in other ways as connected to SAB's scheme as the *Galloway* mailings were to Galloway's scheme. Both SAB and Galloway caused another party to mail vehicle title applications to WDOT, Galloway caused a dealer to do the mailing while SAB caused a Driver's License Examiner to do the mailing. Further, both SAB and Galloway caused vehicle title application mailings to WDOT in order to transfer title to the victim of an illegal odometer roll back scheme.

■ We find unpersuasive Fallon's attempt to distinguish the mailings here from the *Galloway* mailings. None of his three arguments is supported by the facts or by case law.

First, we find that these mailings were "in furtherance of" SAB's scheme. It is irrelevant that WDOT used a computer that enabled the Elkhart Exam Station to issue a blank title to SAB before mailing documents to WDOT. As the lower court found, No. 84–CR–55, Mem.Op. at p. 3

(Dec. 7, 1984), the mailing was still necessary to obtain an on-going supply of alterable titles. It was required by WDOT and occurred as a preliminary step before every fraudulent sale. Even if the documents were not mailed to transfer title but "merely" for record-keeping purposes as Fallon contends, SAB still caused the mailings when applying for title. Therefore, even though the computer speeded the title transfer process, it did not eliminate the need for a mailing. The mailings were still "in furtherance of" the scheme and made "for the purpose of executing such scheme."

Second, we find that these mailings were "essential to" SAB's scheme. We fail to see how WDOT's lax enforcement of the mailing requirement (by pursuing the policy of creating dummy documents when application documents are not mailed) removes this case from the mail fraud statute. It is irrelevant that the Exam Station could have accidentally failed to make one or two mailings without affecting the success of SAB's scheme. As the district court found, No. 84–CR–55, Mem.Op. at pp. 4–5 (Dec. 7, 1984), it certainly would have drawn attention to SAB's scheme if the Exam Station routinely failed to mail SAB's application documents. On-going mailings were indeed "essential to" SAB's scheme.

Furthermore, the case law is squarely contrary to Fallon's assertion that whether an individual mailing is "essential to" the scheme is the test for whether a mailing is "for the purpose of executing" a fraudulent scheme under § 1341. *United States v. Maze,* 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974) ("it is not necessary that the scheme contemplate the use of the mails as an essential element"); *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954) (same); *United States v. Bosby,* 675 F.2d 1174, 1183 n. 16 (11th Cir.1982) (same). We have often held that a mailing which is a normal concomitant of a transaction that is essential to the fraudulent scheme is made for the purpose of executing that scheme and constitutes mail fraud. *Galloway,* 664

F.2d at 163; *United States v. Clark,* 649 F.2d 534, 542 (7th Cir.1981); *United States v. Lea,* 618 F.2d 426, 430 (7th Cir.1980), *cert. denied,* 449 U.S. 823, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980); *Ohrynowicz v. United States,* 542 F.2d 715 (7th Cir.1965), *cert. denied,* 429 U.S. 1027, 97 S.Ct. 650, 50 L.Ed.2d 630 (1976). Obtaining an alterable title was a transaction essential to SAB's scheme, and the WDOT mailings were a normal concomitant of that transaction. On this basis these mailings clearly constitute mail fraud under § 1341.

Third, we wholly reject Fallon's final contention that the mailings from the Exam Station to WDOT in Madison increased the likelihood of SAB's scheme being discovered. Such a claim is inconsistent with Fallon's simultaneous argument that SAB was indifferent as to whether the mailings were made. Furthermore, we are unable to see as a factual matter how the mailings increased SAB's chances of being discovered. The lower court did not make such a finding. Fallon merely states that "[i]f one of [SAB's] applications was spot-checked, the odometer discrepancies would have been readily apparent, thereby endangering the success of the scheme." Effective spot-checking could occur with or without a mailing, however, under Fallon's own description of the facts. When WDOT discovers in cross-checking its computer files with its document files that a document is missing and then creates a "dummy" containing all known information, this dummy would presumably include all information entered on the computer. This information is the same as the information on the original underlying documents. Thus a later spot-check of a dummy document for content accuracy could as likely result in SAB's liability as a similar spot-check of the original documents. We, therefore, find it unnecessary to address whether *United States v. Maze, supra,* and *Galloway* establish a rule regarding mailings that increase the probability of a scheme being detected.

Finally, we note that this case is otherwise readily distinguishable from *United*

*States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). In *Maze*, the defendant used a stolen credit card to buy goods from various merchants. The merchants sent the credit card charge slips to the billing bank by U.S. mail. The billing bank then billed the credit card owner, also by mail. As we noted in *Galloway*, the *Maze* court found these mailings insufficient to constitute mail fraud because "the mailings were 'directed to the end of adjusting accounts' between the various victims of Maze's scheme" and " 'there [was] no indication that the success of this scheme depended in any way on which of his victims ultimately bore the loss.' " *Galloway*, 664 F.2d at 165 (quoting *Maze*, 414 U.S. at 402, 94 S.Ct. at 649). Such a situation does not exist here. SAB's mailings were not made after the fraud to pass the loss from one victim to another; they occurred beforehand as a necessary preliminary step. Maze was indifferent as to whether the mailings helped expose each individual fraud because his credit card scam did not depend on an on-going relationship with any one merchant; SAB's scheme, on the other hand, depended on an on-going relationship with WDOT that required regular mailings.

### III.

Fallon claims that the jury impermissibly considered the testimony of Richard Huebner, thereby denying him a fair trial. Fallon claims that, although instructed to the contrary, the jury must have considered Huebner's testimony because without that testimony the evidence was insufficient to convict Fallon of conspiracy to alter vehicle odometers. Fallon also claims that without Huebner's testimony the evidence was insufficient to convict him of aiding and abetting mail fraud.

Fallon's right to a fair trial was not violated. The lower court correctly ruled that there was sufficient evidence, apart from Huebner's testimony, from which the jury could conclude beyond a reasonable doubt that Fallon conspired to alter vehicle odometers and aided and abetted mail

fraud. Moreover, even if the jury considered Huebner's testimony, Fallon's right to a fair trial was not violated.

### A.

The test for the sufficiency of evidence in support of a criminal conviction is well-established. We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Bonansinga*, 773 F.2d 166, 172, slip op. at 10 (7th Cir.1985) (citing same); *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984) (quoting same); *United States v. Green*, 735 F.2d 1018, 1023 (7th Cir.1984) (quoting same). "[O]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn a verdict." *United States v. Hyman*, 741 F.2d 906, 908 (7th Cir.1984) (quoting *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984)). We also bear in mind that "circumstantial evidence plays a substantial role in conspiracy trials because of its relevance in establishing conspiracies and the general inability to obtain direct evidence of a conspiratorial agreement." *United States v. Green*, 735 F.2d at 1023 (quoting *United States v. Roman*, 728 F.2d 846, 858 (7th Cir.1984), *cert. denied*, —— U.S. ——, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984)).

■ There was sufficient evidence at trial, apart from Huebner's testimony, from which a rational jury could conclude beyond a reasonable doubt that Fallon was guilty of the charges in all counts. The prosecution introduced substantial evidence including the following: documents indicating that Fallon purchased cars with high mileage readings and resold them with lower mileage readings, testimony that Fallon was a SAB manager at a time when 95

percent of the cars that SAB sold were altered, testimony that SAB and Fallon used the WDOT auto titling process to conceal odometer roll backs, testimony that Fallon discussed how to change odometer reading entries on existing vehicle titles, and testimony that at least one dealer had told Fallon that the dealer would buy a certain car if it had fewer miles on it. It requires no extended discussion to find this evidence sufficient to support Fallon's conviction for conspiracy to alter vehicle odometers and for aiding and abetting mail fraud.

## B.

Furthermore, even if the jury considered Huebner's testimony, Fallon received a fair trial. The trial judge was not required to exclude Huebner's testimony merely because that testimony was given as a result of a "performance deal" with the government. Consideration of that testimony by the jury could not have given Fallon an unfair trial.

Accomplices and co-conspirators who have been granted immunity from prosecution are generally competent to testify. They are competent under the Federal Rules of Evidence, Fed.R.Ev. 601, and under long-standing case law. *Washington v. Texas*, 388 U.S. 14, 22, 87 S.Ct. 1920, 1924, 18 L.Ed.2d 1019 (1967); *Hoffa v. United States*, 385 U.S. 293, 311–12, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966); *Rosen v. United States*, 245 U.S. 467, 470–72, 38 S.Ct. 148, 149–50, 62 L.Ed. 406 (1918); *Benson v. United States*, 146 U.S. 325, 337, 13 S.Ct. 60, 64, 36 L.Ed. 991 (1892); *United States ex rel. Swimley v. Nesbitt*, 608 F.2d 1130, 1133–35 (7th Cir.1979).

Huebner's performance deal presents no special considerations that convince us to deviate from the general rule of accepting his testimony as the testimony of an accomplice who has made a favorable deal with the prosecution. Huebner's deal conditions lenient treatment upon his "complete and truthful cooperation." It indicates that there would be at most three charges brought, that these charges would be de-layed until Huebner "had completed his cooperation with the government," and that "if the level of cooperation would materialize as represented, ... the government would, at the time of sentencing, recommend that the client not be incarcerated." The agreement further states that only upon completion of Huebner's cooperation would the government "be in the best posture to evaluate the witness' efforts." The agreement concludes that "the government could decide to charge Huebner with less than the three aforesaid counts if in the considered opinion of the responsible Assistant U.S. Attorney he, in his sole judgment, decided the level of cooperation so warranted." Tr. at pp. 521–23 (Sept. 4, 1984).

Courts have upheld agreements similar to Huebner's. In *United States v. Dailey*, 759 F.2d 192 (1st Cir.1985), the court allowed the testimony of three co-conspirators who had made performance deals with the prosecution. The agreement reached with two co-conspirators provided that "depending principally upon the value to the Government of the defendant's cooperation, the Government, in its sole discretion, may recommend [a reduced sentence]". *Dailey*, 759 F.2d at 194. The agreement of the other co-conspirator conditioned a stay of sentencing and government support for the co-conspirator's motion for a reduced sentence upon "the value or 'benefit' of his information to the government." *Dailey*, 759 F.2d at 196. Although expressing "concern and uneasiness ... over the coercive potential of these plea agreements", the *Dailey* court held that "the risk of perjury created by the agreements is not so great that Dailey's due process rights will be violated by the admission of the accomplice's testimony at trial." *Dailey*, 759 F.2d at 196. Many cases have allowed the testimony of informers whose payment, whether it be leniency or cash, was contingent upon the beneficial results obtained by their testimony. *United States v. Valle-Ferrer*, 739 F.2d 545, 546–47 (11th Cir.1984) (allowing testimony of informant who would receive $1,000 only if testimony

resulted in conviction); *United States v. Jones,* 575 F.2d 81, 85–86 (6th Cir.1978) (allowing testimony of informant who would receive $1,000 only if investigation "successful"); *United States v. Edwards,* 549 F.2d 362, 365 (5th Cir.1977), *cert. denied,* 434 U.S. 828, 98 S.Ct. 107, 54 L.Ed.2d 87 (1977) (allowing testimony of informant whose payment was contingent upon "final results"); *United States v. Dickens,* 524 F.2d 441, 446 (5th Cir.1976), *cert. denied,* 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976) (allowing testimony of informants "paid on the basis of what they produce"); *United States v. Grimes,* 438 F.2d 391, 395–96 (6th Cir.1971), *cert. denied,* 402 U.S. 989, 91 S.Ct. 1684, 29 L.Ed.2d 155 (1971) (generally allowing testimony obtained under contingency deals). Courts also routinely allow the testimony of accomplices who have been promised leniency conditioned upon adequate cooperation. *United States v. Carengella,* 198 F.2d 3, 6 (7th Cir.1952), *cert. denied,* 344 U.S. 881, 73 S.Ct. 179, 97 L.Ed. 682 (1952); *United States v. Kimble,* 719 F.2d 1253 (5th Cir. 1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); *United States v. Evans,* 697 F.2d 240, 245 (8th Cir.1983), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 352 (1983). It requires no extension of these authorities to allow Huebner's testimony.

In our legal system, the danger of perjured or unreliable testimony from immunized accomplices is minimized not by excluding that testimony but through the use of procedural safeguards. The Supreme Court discussed these safeguards in connection with the testimony of an informant who had been rewarded for his information with leniency and money:

[This informer], perhaps even more than most informers, may have had motives to lie. But it does not follow that his testimony was untrue, nor does it follow that his testimony was constitutionally inadmissible. The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.

*Hoffa v. United States,* 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966). The adequacy of these procedures is also recognized in the circuits. *United States v. Daily,* 759 F.2d 192, 196 (1st Cir.1985); *United States v. Evans,* 697 F.2d 240, 245 (8th Cir.1983), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 352 (1983); *United States v. Jones,* 575 F.2d 81, 85–86 (6th Cir.1978); *United States v. Insana,* 423 F.2d 1165, 1168–69 (2d Cir.1970), *cert. denied,* 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970).

▇ Fallon's rights of due process would be adequately protected by informing the jury of the terms of Huebner's deal, subjecting Huebner to vigorous cross-examination, and properly instructing the jury.[1] The lower court went beyond this and instructed the jury to totally disregard Huebner's testimony. This instruction was favorable to Fallon and could not have denied him due process. Fallon thus has no grounds upon which to base a motion for mistrial.

We also note that there are factors besides the Due Process clause which limit the government's use of performance deals based on results or vesting large amounts of discretion in the prosecution. As the deal becomes more discretionary or based on results, the accused becomes less likely to accept it because it is less favorable to him or her. The government must also balance the benefit from testimony obtained under a performance deal against that testimony's decreased credibility. Although these factors do not provide the immutable guarantee of the Due Process clause against outrageous deals or against testimony not adequately qualified by procedural safeguards, they provide some assurance that even well within the bounds of due process the government is constrained

---

1. *See, e.g., Federal Criminal Jury Instructions of the Seventh Circuit,* 3.19, 3.20, 3.22, and 3.23 (1980).

from freely dictating the terms of leniency deals to co-conspirators and accomplices.

## IV.

The district court correctly found that SAB committed mail fraud and that Fallon aided and abetted that fraud. The court also correctly denied Fallon's motion for mistrial. The trial court's judgment and denial of all motions is, therefore, hereby

AFFIRMED.