**UNITED STATES v. AMAN.**
No. 10866.

United States Court of Appeals
Seventh Circuit.

Jan. 29, 1954.

Rehearing Denied March 5, 1954.

Frank J. McAdams, Jr., John J. Cassidy, Jr., Chicago, Ill., for appellant.

Irwin N. Cohen, U. S. Atty., Charles V. Kralovec, Asst. U. S. Atty., Chicago,

Ill., Otto Kerner, Jr., U. S. Atty., for appellee.

Before FINNEGAN and LINDLEY, Circuit Judges, and PLATT, District Judge.

FINNEGAN, Circuit Judge.

Defendant [1] was tried by a jury on a five count indictment. He was found guilty under two counts grounded on 18 U.S.C. § 2314 (Supp. V), 18 U.S.C.A. § 2314, proscribing transportation, in interstate commerce, of property knowing the same to be stolen. Not guilty verdicts were simultaneously returned on counts of the same indictment charging violations of 18 U.S.C. § 659 (Supp. V), 18 U.S.C.A. § 659, and conspiracy.[2]

Aman's sentence was suspended and he was placed on probation for one year on each of counts II and IV, to run consecutively.

All counts name Gene Lombardi as a co-defendant with Aman. Lombardi was found guilty on his plea of *nolo* *contendere,* Fed.R.Crim.P. 12(a), 18 U. S.C., to the fifth count, and sentenced to one year and a day. Counts I and IV were dismissed, as to him, on his own motion. Called as a witness, by the district court, Lombardi testified at Aman's trial.

Defendant's motions for acquittal, made at several junctures of the proceedings below, were all denied. He first moved for acquittal when the government rested its case, then at the close of all the evidence, renewing this motion within five days after the jury was discharged. By this last motion he also sought a new trial under Fed.R.Crim.P. 29(a). During the oral arguments, before this Court, defendant's counsel stated that his client was not asking for a new trial, only for an order of acquittal. Cf. Bryan v. United States, 1950, 338 U.S. 552, 553, 555, 556, 70 S.Ct. 317, 94 L.Ed. 335.

We cannot consider the first motion for acquittal, made at the close of

1. Aman is referred to as "defendant." Lombardi, co-defendant, is designated herein by name.

2. Aman's motion to inspect the minutes of the grand jury which returned this indictment was denied in U. S. v. Aman, D.C. N.D.Ill.E.D.1953, 13 F.R.D. 430; The pertinent counts were as follows:

Count Two

"The April 1952 Grand Jury charges:

"That the defendants, James Aman and Gene Lombardi, on or about, to wit, December 2, 1951, did unlawfully, wilfully and knowingly transport and cause to be transported in interstate commerce, that is, from the City of Chicago, in the State of Illinois, to, to wit, at or near the town of High Point, in the State of North Carolina, certain merchandise theretofore stolen, that is to say, the merchandise more specifically described * and set forth in the First Count of this indictment, which said description of said merchandise is incorporated herein by reference as though more fully set forth and made a part hereof, and which said merchandise was then and there of the value of more than $5,000.00, and the said defendants then and there knew the same to have been stolen at the time the said merchandise was transported as aforesaid: in vio-

lation of Section 2314, Title 18, United States Code."

Count Four

"The April 1952 Grand Jury further charges:

"That the defendants, James Aman and Gene Lombardi, on or about, to wit, December 10, 1951, did unlawfully, wilfully and knowingly transport and cause to be transported in interstate commerce, that is, from the City of Chicago, in the State of Illinois, to, to wit, at or near the intersection of United States Highway No. 421 and State Road No. 16 in Wilkes County, in the State of North Carolina, certain merchandise theretofore stolen, that is to say, the merchandise more specifically described * and set forth in the third count of this indictment, which said description of said merchandise is incorporated herein by reference as though more fully set forth and made a part hereof, and which said merchandise was then and there of the value of more than $5,000.00, and the said defendants then and there knew the same to have been stolen at the time the said merchandise was transported as aforesaid: in violation of Section 2314, Title 18, United States Code."

* Counts one and three, respectively, particularize "400 Cases of Seagrams Seven Crown Whiskey."

the government's case, because thereafter defendant offered evidence on his own behalf. By so doing, he abandoned that motion. Gaunt v. United States, 1 Cir., 1950, 184 F.2d 284; Lii v. United States, 9 Cir., 1952, 198 F.2d 109.

█ Post verdict appeals, such as this one, reaching us after denial of a motion for judgment of acquittal, bring into clear relief certain contours of our reviewing powers. Such boundaries have been frequently delineated by this Court.[3] United States v. Hack, 7 Cir., 1953, 205 F.2d 723, certiorari denied, 1953, 346 U.S. 875, 74 S.Ct. 127. While at the same time, we enunciated those principles which formulate the criteria for measuring the evidence received and proceedings had, at the trial level.

This record justifies stripping the appeal of any issue concerning the status of the property transported, or its value. The whiskey involved was shown to have been stolen property. It was of the requisite statutory value. No point has been raised concerning jury instructions, nor does the record show the District Judge's charge to the jury.

From our appraisal of this record, we think that the following portions of evidence, taking a view thereof most favorable to the government, supply the requisite backdrop against which the key issues, here, must be examined.

Near Hammond, Indiana, in the early morning hours of November 27, 1951,[4]

five unidentified men seized a vehicle (truck and sealed trailer) containing about 800 cases of Seagram's whiskey. This episode was related by a Government witness—the shipper's driver. He also testified that he had never seen nor heard of Aman before this trial.

In the middle of November, 1951, another truck driver, George R. Bowman met Aman for the first time at his (Bowman's) place of business, called Hogan's Service Station, 1510 South State Street, Chicago, Illinois. Gene Lombardi, Walter Kniaz and Norman Shapiro were also present at this initial meeting. Subsequently Bowman saw Aman, and the same three men, at about one A. M. on Friday the 27th or 28th of November, 1951. Concerning this occasion, Bowman testified, "Mr. Aman said to Mr. Kniz * that the load had been cancelled and he would not be able to load at that time, that the warehouse was closed, and that the loading date would be postponed." Kniaz complained about the equipment being idle and Bowman related that Aman gave one hundred dollars to Kniaz who in turn gave it to Bowman. Continuing his testimony, Bowman stated, "At the time Aman said he would let us know when he was ready to load and everything was ready to move."

One week later, on a Friday, in the latter part of November, 1951, Bowman saw Gene Lombardi and talked with

3. This is a convenient juncture at which to footnote some pronouncements, on point, by this Circuit: United States v. Kocmond, 1953, 200 F.2d 370, certiorari denied 345 U.S. 924, 73 S.Ct. 782, 97 L.Ed. 1355; United States v. Moloney, 1953, 200 F.2d 344; United States v. Yoeman-Henderson, Inc., 1952, 193 F.2d 867; United States v. Sylvanus, 1951, 192 F.2d 96, certiorari denied, 342 U.S. 943, 72 S.Ct. 555, 96 L.Ed. 701; United States v. National City Lines, 1951, 186 F.2d 562, certiorari denied, 341 U.S. 916, 71 S.Ct. 735, 95 L.Ed. 1351; United States v. Empire Packing Co., 1949, 174 F.2d 16, certiorari denied, 337 U.S. 959, 69 S.Ct. 1534, 93 L.Ed. 1758; United States v. O'Brien, 1949, 174 F.2d 341; United States v. Randall, 1947, 164 F.2d 284,

certiorari denied, 333 U.S. 856, 68 S.Ct. 729, 92 L.Ed. 1136, rehearing denied, 333 U.S. 878, 68 S.Ct. 901, 92 L.Ed. 1153; United States v. Bach, 1946, 151 F.2d 177; Butler v. United States, 1943, 138 F.2d 977; United States v. Monarch Distributing Co., 1940, 116 F.2d 11, certiorari denied, 312 U.S. 695, 61 S.Ct. 732, 85 L.Ed. 1130. See also: Orfield, Appellate Review of the Facts on Criminal Cases, 12 Fed.R.D. 311 (May, 1952).

4. It is the proximity in time between the hi-jacking and Bowman's two trips to North Carolina which the Government (its brief, p. 19) urges as demonstrative of Aman's guilty knowledge.

* Spelling as it appears in the record of Bowman's testimony.

him. Aman was in their vicinity. On the following Sunday, Gene Lombardi telephoned Bowman at the home of Robert McGill, one time brother-in-law of Bowman. Thereafter Bowman went to Hogan's Gas Station and waited for Lombardi who subsequently arrived. Bowman drove his truck to the 7300 block on Lake Street. After he parked the vehicle Lombardi picked him up and at approximately four-thirty in the afternoon they went to a restaurant. Aman arrived while these men were having coffee and told them to move the truck; "* * * to get away from there; that the parties that were picking up our truck would not drive it away while we were in that vicinity." Bowman reported the defendant as saying: "Aman told Lombardi let us get out of there and meet him at such and such a place." Bowman recalled this location as being a drug store in the 4500 or 4000 block on Lake Street. After this conversation, Aman departed, Bowman and Lombardi proceeded to the drugstore (at approximately five-thirty to quarter of six in the afternoon) where Aman joined them having coffee. Bowman's memory of the conversation at this meeting is confined to his recollection that, "Mr. Aman told us to meet him then at the thirty-eight hundred block † on Harlem Avenue." Traveling in Lombardi's car, Bowman and Lombardi drove to that point and waited in the car. Aman came up to their vehicle and advised that they would be ready in a few minutes. Then Lombardi, Aman and Bowman proceeded to a gas station where Lombardi's car was filled with gas. At this point in his testimony Bowman related that: "We pulled back to the original spot where we were standing in front of the fruit stand, where we were sitting. We were facing south on Harlem at that time, and a car

pulled up across the street, and Mr. Aman got out and walked across the street to this car; and then he came back and said, 'Your truck is parked a block and a half south on the right-hand side of the street.' And he went away, and Lombardi and I drove down and I left him sitting there, and I got into my truck and drove out of town." Bowman said he did not know what was loaded [5] in his truck.

Pursuant to Lombardi's instructions, Bowman followed him to Winston-Salem, North Carolina, where the cargo was delivered to Wayne Morris. Morris, Bowman, and five or six other men unloaded Seagram's whiskey from Bowman's truck, transferring it to several smaller trucks. Lombardi paid Bowman $500 for this trip.

After that delivery Bowman saw Lombardi and Aman at the service station. It was approximately three-thirty or four o'clock in the afternoon. At this meeting, about the 8th or 9th of December, 1951, Lombardi told Bowman they had another load going south.

On this occasion Bowman parked his truck on 12th Street about a block West of Cicero Avenue, leaving his keys in it pursuant to instructions. Lombardi again picked up Bowman and they went to a tavern where Aman met them, around five o'clock, and said the procedure would be the same. Again, Bowman and Lombardi went to Ogden and Harlem Avenues and parked. Aman arrived and got into their car where he remained ten to fifteen minutes. He asked Lombardi if he (Lombardi) had given Bowman money. Then, Bowman testified that Aman said, "* * * just to sit tight and he would let us know when it was ready." Aman got out of the car, and left the two men sitting there. He returned in about twenty to twenty-five minutes and told them, "Be

---

† "Q. Was there any particular time mentioned? A. Around eight-thirty." (T.R. 39.)

5. Paragraph 4, page 22 of the Government's brief and argument, particularly notes that there is no testimony that

Aman observed any of the stolen whiskey cases.

Bowman testified on cross-examination that he did not think the whiskey stolen. (T.R. 84.)

ready in a few minutes." Bowman then says, a car pulled up and "* * * he (Aman) went out of the car and whatever they said I don't know, but he (Aman) came back to the car and said, 'The load is ready and it is parked in the same place.' He got back in with these people and rode away." Bowman received $500 from Lombardi for this trip to Wilkes County, North Carolina, where he delivered about 400 cases of Seagram's whiskey. This time the unloading scene was illuminated by flashlight and Bowman's cargo was transferred in part to other trucks and the balance stored in a shed about 50–75 feet behind a house. Bowman identified various government exhibits as being whiskey cases similar to those he had unloaded at the terminals of his two previous trips to North Carolina.

On redirect examination Bowman recounted details of a shipment of Old Thompson Whiskey, on the first or second of November, 1951, from a warehouse on Lincoln Avenue to North Carolina. Aman paid him $400 for this hauling job. During Bowman's testimony this transaction was termed "legitimate," viz., not involving stolen whiskey, but destined for a dry county down south. Aman's last name was not known to Bowman during the early stages of these events.

Aman's co-defendant, Gene Lombardi, testified after being called by the district judge. He virtually corroborated Bowman's evidence concerning the shipments to North Carolina, but he particularly denied that the defendant Aman was present at any of the times charged in the indictment. Moreover, Lombardi expressly removed Aman from all of the meetings to which Bowman had testified. In fact he denied knowing Aman prior to June 19, 1952.

Walter Kniaz whose place of business is also located at 1510 South State Street, appeared on behalf of the Government. He admitted a conviction for larceny of a motorcycle some twenty-two years prior to his testimony, for which he served a year and a half.

He first met Aman sometime in September, 1951, at 1510 South State Street, when Gene Lombardi was looking for a truck to go south. At this first meeting Aman said nothing.

During the first part of October, Kniaz met Aman and Lombardi. Kniaz introduced Bowman to Gene Lombardi, saying in Aman's presence that Bowman would go south.

With respect to the meeting sometime in November, 1951, Kniaz said: "Lombardi had a load to pick up on the North Side to go South, so Bowman agreed to take that load South; and later on in the day, Jim came over. Jim had given him some money I believe."

In the first part of November, 1951, and in December, 1951, Kniaz saw Aman again. He recalled that on this latter occasion Aman drove up in a car bearing a license plate "323." Thereafter,[6] Kniaz relates on a Saturday morning the following: "Well, Lombardi wanted this truck to go South. He said Jim is going to be in to tell us where to pick it up, that is, Mr. Lombardi, where to pick it up, and Jim went into the station to make a few calls. He made five or six calls,* and came back and told Lombardi they can't pick it up, the warehouse is closed." Kniaz stated Bowman and Lombardi were present at that time.

Kniaz testified that he had telephoned Aman several times in November, 1951, and had written Aman's telephone number on a piece of paper which he turned over to the F.B.I. Furthermore, having seen Aman's billfold, in November, 1951,

---

**6.** The record is blurred as to the exact date when this transpired. (Compare brief and argument for the Government, p. 27 with page 20 of appellant's brief and argument.)

*The Government urges these telephone calls as part of its argument concerning Aman's

knowledge, prefacing such position by the comment (Govt. brief, p. 26):

"It is true that in this case, as in most others requiring proof of guilty knowledge, the Government relied upon circumstantial evidence and the reasonable inferences deductible therefrom."

he knew Aman was a police officer. He testified further that Aman gave one hundred dollars to Bowman.

In June or July, 1952, Kniaz identified James Aman at the offices of the F.B.I. Kniaz admitted hauling loads for Shapiro during 1948 and 1949.

Called as a witness by the Government, Wayne J. Morris acknowledged Bowman's deliveries, but denied ever having seen Aman before his (Morris') testimony.

During his testimony for the Government, Robert McGill stated that for twelve years his place of business was at 1510 South State Street. He had employed Bowman for about two and one half years. McGill flatly denied having ever seen Aman prior to testifying.

Agents of the Federal Bureau of Investigation corroborated the evidence concerning the shipments. They had seized the whiskey, apprehended the various participants, and took statements. Asked by these agents if he knew Gene Lombardi, George Bowman, Walter Kniaz and Robert McGill, the defendant Aman replied "No." Aman disclaimed any knowledge of the affair when questioned by the agents.

Testifying in his own behalf, Aman stated that he joined the Chicago Police Department on March 25, 1933 and held the grade of sergeant. He denied ever having seen Bowman, Kniaz and McGill. He had not seen Lombardi prior to June 19, 1952, and saw him thereafter in the presence of several attorneys. Asked on direct examination if he had anything to do with this particular offense, Aman testified "I did not have anything to do with it whatsoever."[7] Cross examination did not pursue these points, save to establish that Aman's motor vehicle license plate, in 1951, was 323,153.

Several high-ranking police officers and attorneys were called by the defendant and each of them testified favorably as to his reputation for truth, veracity and good character.

■ Substantial evidence, as a criterion, is not a legal absolute. Nor could it be and remain an effective implement of the judicial process. For this reason it has not been reduced to a precise formula, though there are certain bench marks indicative of such a quantum of evidence. See e. g. Curley v. United States, 1947, 81 U.S.App.D.C. 389, 160 F.2d 229 certiorari denied 1947, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850; United States v. Feinberg, 2 Cir., 1944, 140 F.2d 592, 594, 154 A.L.R. 272, certiorari denied 1944, 322 U.S. 726.

United States v. Yeoman-Henderson, Inc., 7 Cir., 1952, 193 F.2d 867, 869, 64 S.Ct. 943, 88 L.Ed. 1562, reflecting as it does our views concerning a motion for judgment of acquittal, contains this pertinent statement:

> "When a motion for a judgment of acquittal is made, the sole duty of the trial judge is to determine whether substantial evidence, taken in the light most favorable to the government, tends to show the defendant is guilty beyond a reasonable doubt * * *."

■ What chiefly emerges from our study of this evidence is Aman's position as supervising-dispatcher of the whiskey loads to their destinations. Determination of the credibility of those witnesses who cast him in that role is not within our province or that of the judge below. Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680. We are of the opinion that there is sufficient evidence on which the jury could predicate their solution of the issues concerning Aman's responsibility under § 2314, supra, and that the evidence supports their verdict.

The later motions for a judgment of acquittal were rightly denied. Since we find no reversible error upon this record, nor merit in any other points urged by defendant, the judgment of the District Court must be affirmed.

Affirmed.

---

7. Defense counsel put it to Aman as follows:

"Q. You don't know any of these people? A. I don't." (T.R. 166.)