UNITED STATES of America,
Plaintiff-Appellee,

v.

Ronald J. GREEN, Defendant-Appellant.

No. 85–2356.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 24, 1986.

Decided Feb. 25, 1986.

Rehearing Denied March 31, 1986.

James M. Conway, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

David M. Mattenson, Kantos & Mattenson, Ltd., Chicago, Ill., for defendant-appellant.

Before POSNER and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

It is unlawful for a driver to leave the scene of an accident. Many leave nonetheless, and if the police learn the license plate number of the departing car, they ask the owner of the car to come in for an interview. The officer conducting the interview may determine whether the owner of the car was involved in the illegal conduct and, if so, whether a dispute about the accident should be settled between the parties rather than through the criminal process. If the officer determines the need, he may issue a citation. This starts a process that could end in suspension or revocation of the driver's license or criminal penalties. The invitation to appear at an interview comes by mail.

This is a case under the mail fraud statute, 18 U.S.C. § 1341. Ronald Green, an officer of the Chicago Police, was assigned to the Major Accident Investigation Section. Other officers would send accident reports to this section, and officers such as Green would find out who owned each car and mail notices to the owners. The notices are form letters, which Green filled out. Each notice states:

A complaint has been made that a vehicle bearing your license number _____ was involved in an accident at _____ on _____. It is therefore requested that either you or the person who was driving your car at the time of the accident appear in person in Room ____, 54 West Hubbard Street, at _____ M., on _____, 19__, to make an accident report as required by law.

The Illinois Revised Statutes make it a punishable offense for anyone involved in a motor vehicle accident to fail or neglect to make a report of such accident. The law also provides that the Secretary of State shall suspend the license of any person who wilfully fails and refuses or neglects to make a report of a traffic accident as required by law.

This is an opportunity for you to state your side of the case. Your cooperation and compliance with the law are earnestly requested. It is also requested that you bring your vehicle with you.

Green filled out and mailed these forms in the line of duty. The indictment charged, and the jury found, that what followed departed from the rule book. The indictment detailed seven occasions on which Green solicited or accepted a bribe from a driver, in exchange for ensuring that the driver's license would not be suspended and that the case would not be referred to the prosecutor. The evidence permitted the jury to conclude that Green sometimes threatened people that their licenses would be suspended if they did not pay. The jury convicted Green on all eight counts—seven of mail fraud and one of racketeering, in violation of 18 U.S.C. § 1962(c). The judge sentenced Green to 18 months' imprisonment on one of the mail fraud counts, to be followed by concurrent terms of five years' probation on each of the other seven counts.

I

Green mailed notices to more than 2,000 people each year during his work in the major investigations section. Each

form was prescribed by his superiors; each was truthful; mailing them was part of his duties. His principal argument is that because he mailed truthful notices under legal command, he did not violate § 1341.

The statute provides: "Whoever, having devised ... any scheme or artifice to defraud, ... for the purpose of executing such scheme or artifice or attempting to do so, [mails] any matter or thing whatever ... or knowingly causes to be delivered by mail ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both." The government charged Green with the "scheme" of inviting people to visit him at the police station, threatening them (explicitly or implicitly) with unpleasant consequences, and separating them from their money. In the course of this scheme he mailed "any matter or thing whatever", a mailing that lured the pigeons to Green's office. It does not matter, the government insists, what was mailed, so long as the mailing was "for the purpose of executing the scheme" and was causally linked to its success. *United States v. Lane,* —— U.S. ——, 106 S.Ct. 725, 733–34, 88 L.Ed.2d 814 (1986); *Kann v. United States,* 323 U.S. 88, 94–95, 65 S.Ct. 148, 150–51, 89 L.Ed. 88 (1944). Although the notices may have been innocent in themselves, the statute applies if their mailing was "a step in a plot". *Badders v. United States,* 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916).

Long ago one could have argued that the mail fraud statute applies only when the mails are used to carry the fraudulent material. If that argument ever carried any weight, it does no longer. The Supreme Court has sustained convictions based on the mailing of "innocent" matter that is an expectable part of a larger scheme. E.g., *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). See also *Badders, supra.* We have held many times that "innocent" mailings may offend the statute if they are integral parts of a scheme to defraud. E.g., *United States v. Bonansinga,* 773 F.2d 166 (7th Cir.1985). The causal connection between the mailing

and the success of the scheme, not the knavery in the mailings, is what matters.

So, too, we have affirmed convictions based on mailings that could be characterized as "legally required." In *United States v. Murphy,* 768 F.2d 1518, 1529–30 (7th Cir.1985), the "scheme" was that Judge Murphy took bribes for deciding cases. The mailings were cash bond refunds, which the judge authorized to be sent by court officials to the lawyers who had paid the money. The court officials were required to send the money, as the judge directed, in the course of their duties, but we sustained Murphy's conviction on the ground that the mailings were useful and expected parts of the scheme. In *United States v. Fallon,* 776 F.2d 727 (7th Cir.1985), and *United States v. Cina,* 699 F.2d 853 (7th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983), the mails were used to carry automobile titles from state officials to the cars' owners. The schemers used innocent state officials to obtain titles showing odometer readings that were less than the cars' actual mileage. The mailings were part of the officials' duties, just as Green's notices were, yet the mailings violated the statute because they were part of the means of carrying out the entire scheme to defraud. Cf. *United States v. Galloway,* 664 F.2d 161 (7th Cir.1981), *cert. denied,* 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982).

Green lamely tries to distinguish these cases on the ground that in them the mailing "really" was integral to the scheme, while here it is not. There is no significant difference on this score. In each of those cases, as in Green's, the mails played an essential role. His real argument is that these cases are inconsistent with *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). The defendants in *Parr* were officials of a school district, and they appropriated some of the district's money. One of the prosecutor's theories was that mail fraud occurred when the school district sent out tax notices and taxpayers remitted by mail. This produced

the fund the defendants tapped. The Supreme Court held that these mailings were not enough: "we think it cannot be said that mailings made or caused to be made under the imperative command of duty imposed by state law are criminal under the federal mail fraud statute, even though some of those who are so required to do the mailing for the District plan to steal, when or after received, some indefinite part of its moneys." 363 U.S. at 391, 80 S.Ct. at 1183.

This language certainly assists Green, but it is not the holding of *Parr*. The Court emphasized not only the "imperative command of duty" but also the prosecutor's neglect to tie the mailings to the success of the scheme or to connect the defendants' acts to the size of the taxes. The Court observed that the government had not tried to establish a plan to use tax notices to carry out a scheme. The plan charged in the indictment was to steal the money, not to collect taxes fraudulently. The indictment did not charge that anyone paid an extra nickle as a result of the plot, so that the mailings were not closely connected to the scheme. The district was bound to levy taxes, so if the scheme did not inflate the taxes the mailings had no substantial connection with the defendants' removal of money from the district's treasury. Of course, the mailings (or some other way of raising money) were necessary to fill the district's coffers; you can't steal from an empty piggy bank. Yet but-for causation has never been enough to support a prosecution for mail fraud. If burglars stole money from the headquarters of United Air Lines, the prosecutor would be able to show that United had used the mails to create the fund from which the burglar stole. This burglary would not be mail fraud. The connection between the mails and the fraud must be more substantial. *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Lane, supra*.

In *Parr* the Court recited the "particular circumstances of this case" it found pertinent, "especially" (363 U.S. at 391, 80 S.Ct. at 1183): (1) the district was legally required to collect taxes; (2) the government had not charged or established that the fraud inflated the taxes; (3) the state law compelling the district to collect taxes also compelled it to use the mails. As a result, the Court concluded, the mailings were not "part[s] of the execution of the fraud", *ibid.*, quoting *Kann v. United States, supra*, 332 U.S. at 95, 65 S.Ct. at 151, or "incident to an essential part of the scheme," quoting *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). The decision was based on the way the government presented the case, not solely on the legal requirement that the district mail tax notices.

*Parr* and other cases require that the government prove that legally-required mailings were important to the successful execution of the fraud. Although this is less clear, *Parr* also may require proof that legally-required mailings were used with specific intent to defraud the recipients of the mail. Both elements were present here. Mailings were essential to Green's plan. Green needed the mailings to reel in the fish. The taxpayers in *Parr* were uninjured (the Court assumed); the recipients of Green's notices suffered. And although Green protests that he did not mail the notices with intent to defraud, this was a disputed inference. The district court instructed the jury that it could convict Green only if it found that Green not only hatched a plan to defraud but also that "for the purpose of carrying out the scheme ... [Green] used the United States mails ... knowingly and with the intent to defraud." If the jury followed these instructions, it found that Green used the mails with the intent to extort money from those who responded to the notices.* The

---

* There were more instructions related to this subject, which the dissenting opinion sets out. They are redundant and use different terms for the same thing, a regrettable consequence of the

district court's decision to give the instructions proposed by both sides. But confusing is not the same as wrong. Green did not challenge these instructions in the district court and does

evidence supports such a conclusion. Green mailed notices and extorted money repeatedly, and the jury could infer that in mailing each notice Green had in mind prior episodes of extortion and contemplated future ones. Green depicts each episode of extortion as an isolated event, a spur-of-the-moment decision unconnected to the mailings. There is evidence, however, from which the jury could find that a plan predated the first mailing charged in the indictment. In July 1981 (six months before the first mailing charged), Green demanded $100 from an attorney representing the driver in a hit-and-run accident. The evidence that Green regularly extorted money supports a conclusion that the notices were designed to put a plan of extortion into action, to create a pool of potential victims from which Green could choose.

## II

The remaining arguments revolve around the identification of Green. His defense was that if anyone took bribes, it must have been some other police officer. The notices told people to come to Green's cubicle, but Green was not there every day. One theory he presents is that the victims named in the indictment arrived while he was out and met someone else.

This was a difficult defense to present. Green signed the notice telling each of the seven victims to come to his office. Time records of the police department show that Green was on duty during the time each victim arrived and was interviewed. Each victim testified at trial that he spoke with a person who called himself officer Green. There is a typed "supplemental report" concerning each interview; each report is signed by the owner of the car, by Green, and by Green's supervisor. Green acknowledges that he filled out and signed these reports but insists that someone else conducted the interviews. This would be highly irregular, if it happened, for officers signing their names to someone else's re-

port are supposed to indicate the identity of the someone else. But bureaucratic irregularities are not the same as mail fraud, so Green stands on the story that he messed up the forms but did not take bribes. The strongest support for this version of events is the difficulty the victims had in identifying Green.

Only one of the seven victims identified Green during the trial. One explanation for this may have been that their fleeting visits with Green had occurred some time ago, and they may not have tried to remember his face (as opposed to his name or badge number). Green was entitled, however, to press the defense that they did not remember him because they had not met him. This produces three issues for our decision. Green asserts that the one in-court identification was attributable to coercion, that the district court should have allowed him to introduce evidence inculpating a colleague, and that the prosecutor overreached when arguing the identification question to the jury.

1. Santo Levato was the only victim to identify Green in court. Levato earlier picked Green out of a photographic display. Green asserts that Levato did this only because he had been threatened by the officer conducting the display, and that this threat irreparably tainted the in-court identification. The display itself was unbiased. After examining the pictures, Levato hesitated. The officer pointed to Green's picture; Levato still hesitated. Then, according to Levato: "Well, when I refused to identify him, he [the officer conducting the review of the photographs] says, 'Is this the man?' He says, 'You don't want to get in no trouble yourself,' but I knew it was him even before he told me, but I just didn't want to get—". There was more in the same vein.

■ The district court concluded that Levato recognized Green's picture at once but declined to identify Green because he did not want to cause trouble for Green. After

---

not challenge them here either. We do not think them plain error. See *United States v.*

*Markowski,* 772 F.2d 358, 363 (7th Cir.1985).

the officer in charge replied that no one wants to be in trouble, Levato identified Green's picture. Levato testified that the exchange with the officer, including both the veiled threat and the officer's identification of Green's picture, did not contribute to Levato's identification of Green in court. Under *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), this is enough to permit the in-court identification even if the photo session was impermissibly suggestive. The district court's finding that the in-court identification is "not the product of what the police officer did" is not clearly erroneous.

█ 2. John Novack, another member of the major accident section, occupied the cubicle next to Green's. Novack apparently has the same build as Green and looks like him. Novack, too, sent out notices and interviewed potential hit-and-run drivers. Novack also has been convicted of extorting money from the people he interviewed.

The district court allowed Green to prove that Novack looked like Green, occupied the adjacent cubicle, and interviewed people who responded to the notices. This supported the defense of mistaken identity. The court prevented Green from telling the jurors that Novack had been convicted of the same offense of which Green stood accused. The court held the fact of conviction not relevant to the case, apparently because Novack had not been convicted of taking money from the seven people who said that Green took money from them.

The court erred in thinking that the fact of Novack's conviction is irrelevant. Green's defense was that someone else interviewed the victims and took their money. That meant showing two things: first that someone else who looked like him could have done the interviewing, and second that the someone else was an extortionist. The fact that Novack had been convicted of taking money in these circumstances increased the chance that if Novack conducted the interviews and was mistaken for Green, he also took money. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence ... more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Not "much more probable," just "more probable." Under such a relaxed standard Novack's conviction was relevant.

The district court might have justified its decision under Fed.R.Evid. 403, which allows a court to exclude evidence if there is a danger of confusion or of misleading the jury. The conviction would help to establish that Novack is the sort of person who, given a chance to extort money from Green's interviewees, just might have done it. But the jury might think that this is an either-or problem—either Novack did all the extorting or Green did. If the jury thought this, it might use Novack's conviction to resolve all doubts in favor of Green even though that would be unwarranted. The evidence, though relevant, is only tangentially so, and the district court possesses substantial discretion under Rule 403. *United States v. Fairchild*, 526 F.2d 185, 189 (7th Cir.1975), *cert. denied*, 425 U.S. 942, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976). See also *United States v. Burke*, 781 F.2d 1234, 1243–44 (7th Cir. 1985) (when the court gives no reason for excluding evidence, we will sustain the exclusion of evidence on any ground the district court might have invoked to this end). The district judge did not invoke Rule 403, however, and did assert an incorrect ground. So we inquire whether the error affected "a substantial right of the party". Fed.R. Evid. 103(a); see also Fed.R.Crim.P. 52(a).

█ It did not. "Substantial right," the language of harmless error, calls for an inquiry into whether the mistake "had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). Unless the error creates a significant risk of convicting an innocent person, it should be disregarded. *United States v. Lane, supra*, 106 S.Ct. at 730–32. No trial is perfect, and a direction to hold another is an invitation to further error and still further proceedings.

We must compare the conduct of this trial not against the hypothetical perfect trial, but against a plausible future trial, beset with the sort of errors that infect almost all trials. Green's was a well-conducted trial at which all of the evidence came out—all but Novack's conviction. Novack's conviction was not central to Green's case; it was far less important than showing that Novack, a look-alike, worked close by. Good thing the conviction was not central. Green or Novack had to go first, and if Novack's trial was good enough without proof that Green had been convicted, Green's trial should be good enough without proof that Novack had been convicted.

The defense of mistaken identity was weak to begin with. Green was in the office at the times the victims were interviewed; he signed the reports; the victims talked to someone who called himself Green. Either Novack was very clever (to call himself Green) and Green very stupid (to sign his name to reports of Novack's interviews), or the people really were talking to Green. The evidence strongly suggests the latter. The error did not affect Green's "substantial rights."

3. The defense was conducted principally by David Mattenson, a partner of Kanter & Mattenson. During portions of the trial at least two of Mr. Mattenson's associates sat at counsel table. One associate did nothing but take notes. He also did not attend the opening statements, and he left before the prosecution's rebuttal case. This associate apparently looked like Green. The prosecutor stated during closing argument:

> [L]et us take a look at the primary issue in the case, which is the matter of the identification ... The first thing that I would like to call to your attention—and I am sure you observed it and realized from the things that happened in court during the last few days—that when a witness was on the stand who was asked to identify from the stand Ronald Green, in those first couple of days there was a person who was sitting next to the de-

fendant who looked very much like the defendant.

MR. MATTENSON: Objection. That is improper argument.

THE COURT: No, he may indicate what transpired in the courtroom. You may respond. There was not anything improper about the attorney sitting at the table, if that is your objection.... [H]e may comment about the events that transpired in the courtroom. The attorney was at the table properly. There is no question about that. Go ahead.

MR. SPENCE [the prosecutor]: And the attorney who was properly at the table was someone who was wearing glasses at the time when the defendant was ... a person whose general physical appearance was very similar to that of the defendant. I think you can note, ladies and gentlemen, that that person isn't here now. He wasn't here earlier in the day and he wasn't here the last day of the trial before that, either.

When you have a situation like that, where there is going to be a question of the identification, the conduct of the trial becomes almost like a game, unfortunately, and you have to take a look at what a trial is supposed to accomplish. A trial is supposed to somehow determine what the truth is; somehow determine exactly what it is that happened....

I submit to you that by putting a look alike next to the defendant, what the defendant has done is to turn this into a game; a charade almost, where he tries to stack the deck and he tries to make it difficult for people who are unfamiliar with a courtroom and who are unfamiliar with the proceedings to somehow get in the way of their determination of the truth.

MR. MATTENSON: Objection. It is improper and an inflammatory argument; no basis in the evidence. It is totally outside the evidence. The man is a partner [sic] in my law firm.

THE COURT: Again, I have instructed the jury that his presence here is and

was proper and I have also indicated that Mr. Spence may address the matters that took place during the trial of this case and those are the limitations on that argument. Go ahead.

MR. SPENCE: Do you remember, ladies and gentlemen, we showed you these pictures [of Green] that a number of witnesses picked out of the photo spread.... [The witnesses] made [a] positive identification from the photo spread of this person. Then he comes into court, his moustache is gone, he doesn't have glasses on now, but you saw him during the conduct of the trial that he did have glasses on, especially during the time when the identification was being attempted....

Well, I submit to you that he was trying to deceive you and the whole charade of putting somebody next to him was part of that attempt, and I also submit to you that a person who is trying to frustrate the truth-seeking process in that way has something to hide.

Green says that this line of argument was grossly improper—that Mattenson's associate was at counsel table for permissible reasons, and that to call this a "game" or "charade" is to subvert the integrity of the fact-finding process for which the prosecutor purported to speak. Green also asserts that the prosecutor's characterization of the timing of the associate's presence is inaccurate.

■ The prosecutor was making two points: first, that witnesses may have had trouble identifying Green because he had changed his appearance and was sitting next to a similar-looking lawyer; second, that the defense team was doing this to make a "game" or "charade" of the trial, which showed that Green had "something to hide." The first of these was proper, the second not—a line the district court twice drew correctly and that the prosecutor twice ignored. A law firm is entitled to use such lawyers as suit its professional purposes without being accused of subverting justice, unless the prosecutor has some evidence that subversion (rather than note-taking) is the reason for the lawyer's presence. The prosecutor had no such evidence. A defendant is entitled to shave his moustache. Both the look-alike lawyer and the disappearing moustache are matters for comment, but appropriate comment. The prosecutor's comments were not appropriate. See generally *United States v. Young*, —— U.S. ——, 105 S.Ct. 1038, 1042–44, 84 L.Ed.2d 1 (1985).

The sin is compounded in the government's appellate brief. This brief states that "a defense attorney who looked like the defendant *was placed* at counsel table *only* during portions of the trial in which in-court identification testimony was sought" (emphasis added). This portrays Mattenson as a puppeteer, "placing" a *doppelgänger* at the table at critical moments "only" and then discarding him so that the real lawyers could do the work the rest of the time. The brief does not cite a source for this assertion, and when we inquired at oral argument we were told that the only source is the closing argument. This is deeply disquieting. The closing argument does not depict Mattenson as a puppeteer; the appellate brief has not accurately conveyed what the prosecutor said. More, Green maintains that the prosecutor was inaccurate. To defend a closing argument by a subtle and unsupported manipulation of a depiction alleged to be inaccurate is to mislead the court. A prosecutor may misspeak in the heat of the battle, but an appellate advocate has the luxury of time (and review by more experienced advocates). We do not expect to see misstatements of this character in briefs. The principal coin of the United States Attorney is credibility. Some of that coin has been wasted in this case.

■ For all this, the closing argument is not reversible error. The district court informed the jury that Mattenson's associate was properly in the courtroom. Mattenson had an opportunity to respond, to tell the jury *why* the lawyer was there, if not to confuse. Mattenson did not take up the challenge during his closing argument. Perhaps the associate was there to take

notes. Mattenson told us at oral argument that he was there to get a "trial credit" so he could be admitted to the trial bar of the Northern District of Illinois (a representation that did not appear in the briefs and that has an odd ring, since a lawyer needs only four trial credits and the associate in question was in his seventh year with Kanter & Mattenson).

The most powerful implication of the prosecutor's argument—that there may have been reasons why the witnesses did not identify Green—was permissible. The improper implications could have been punctured; Mattenson could have turned the tables and made the prosecutor look foolish, had he chosen to disclose why the lawyer was in the courtroom. He did not, and this may have been a tactical decision. Prosecutorial overbearing sometimes backfires. This episode, regrettable though it was, did not affect Green's substantial rights. See *United States v. Mazzone*, 782 F.2d 757, 763–64 (7th Cir.1986). As we have said, an effect on substantial rights means a significant chance of altering the outcome. This comment did not—because the objectionable portion was tangential, because the district court correctly told the jury that the lawyer's presence was proper, and because Mattenson had the weapons to deal with any lingering effects.

AFFIRMED

POSNER, Circuit Judge, dissenting.

Green neither committed mail fraud nor received a fair trial.

His job for the police department was to mail letters to people suspected of having left the scene of an accident—letters inviting them to come in and explain their conduct—and then to interview them when they came in and make recommendations to his superiors for further action. The fraud consisted of extorting money from the people interviewed, and was a fraud on the police department. The government had to show not that the fraudulent scheme would have failed if Green hadn't mailed the letters but that he mailed them "for the purpose of executing" the scheme. 18 U.S.C. § 1341. It is not enough that the mailings were "a step in a plot." That is a cropped quotation from *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916), where Justice Holmes said, "Intent may make an otherwise innocent act criminal, if it is a step in a plot. The acts alleged [the mailings] have been found to have been done for the purpose of executing the scheme...." (Citations omitted.)

It is tempting in a mail fraud case to think of the fraud as the important thing, and the use of the mails as a boring detail. But it is the mailing, not the fraud, that is the crime; each count of the mail fraud part of the indictment against Green is a separate mailing, not a separate fraud. And a mailing violates the statute only when it is made for a fraudulent purpose. The focus of this case should have been on the purpose *of the mailings*; if that purpose was not proved beyond a reasonable doubt to be fraud, Green was entitled to an acquittal.

No reasonable jury, properly instructed (this one was not, as we shall see), could have found, beyond a reasonable doubt, that fraud was Green's purpose in mailing the letters. So far as appears, he mailed them only because it was his official duty to notify by mail persons who he discovered had left the scene of an accident. If he hadn't mailed the letters he would have been fired. He took advantage of the flow of miscreants that the letters generated to extort money; but it was not to generate the flow that he mailed the letters; it was to keep his job. There is no evidence that he took the job because it would give him an opportunity by use of the mails to reel in fish to shake down, or that he mailed letters to people he thought particularly susceptible to being shaken down, or mailed more letters than he would have done if he had not had fraud in his heart or drafted the letters in such a way as to make it easier to shake down the recipients. He did not draft the letters. They were form letters, which he mailed indiscriminately to anyone believed to have left

the scene of an accident—an average of 1,500 a year. We do not even know whether he contemplated fraud at the time that he mailed any of the letters. In particular we do not know whether he contemplated fraud when he mailed the first one for which he was convicted or when he mailed the letter that brought in a person who offered him a bribe unsolicited, which was the basis of another count. The silence of the government's brief on these issues is deafening.

It is true that in its rebuttal case the government showed that Green had shaken down a recipient of one of his letters months before the mailing of the letter that formed the basis of the first count in the indictment. As an original matter one might have thought that this evidence came too late; that if Green should have been acquitted at the close of the prosecutor's case, when his counsel moved for an acquittal (Fed.R.Crim.P. 29(a)), the error in denying the motion could not be cured by rebuttal evidence. The Second Circuit so held recently. *United States v. Neary*, 733 F.2d 210, 219–20 (2d Cir.1984). This decision seems, however, inconsistent with a long line of cases in this and other circuits holding that a defendant abandons his motion to acquit by putting in his own case after the motion is denied. See, e.g., *McGautha v. California*, 402 U.S. 183, 215–16, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971) (dictum); *United States v. Tubbs*, 461 F.2d 43, 45 (7th Cir.1972); *United States v. Aman*, 210 F.2d 344, 345–46 (7th Cir.1954); *United States v. Foster*, 783 F.2d 1082 (D.C.Cir.1986) (en banc). These cases do not deal with rebuttal evidence, but rebuttal is logically and practically as much a part of the defendant's case as cross-examination of the defendant's witnesses; and under the rule established in our circuit in *Aman*, evidence favorable to the government that comes out in the defendant's case can be used to bolster the government's case in chief.

This is hardly the case in which to reexamine *Aman* in light of *Neary*, especially since Green has not asked us to do so. I shall therefore assume that the evidence of the earlier shakedown could be used to help show that when Green mailed the first letter for which he was indicted he did so with a fraudulent purpose. Only that earlier shakedown doesn't show this. That a letter was mailed for the purpose of extortion cannot be inferred just from the fact that a recipient of a previous letter was shaken down. The logic of such an approach would be that every letter that Green mailed after he first shook down a recipient constituted a separate, indictable offense under the mail fraud statute; we might see an indictment with more than 1,000 counts, brought against a person who had been required by law to make each mailing that formed the basis of a count. The majority might embrace this logic, for its opinion says that "the jury could infer that in mailing each notice Green had in mind prior episodes of extortion and contemplated future ones." This seems artificial in the extreme. One might as well say that in brushing his teeth every morning he thought about past and upcoming extortion. All that the evidence shows is that he shook down some, perhaps no more than one in a thousand, of the people he sent letters to. Who can say whether, when he sent the particular letters for the mailing of which he was indicted, he thought to himself, "Ah hah! This letter may reel me in a fish"? Who can say this with the confidence required to find guilt beyond a reasonable doubt? Although it is possible that Green mailed the letters both because it was his job to do so and because they were the bait for his scheme of extortion, the fact that it *was* his duty to mail these letters makes it impossible to infer a dual purpose from the bare fact that he shook down some of the recipients. He would have shaken them down to exactly the same extent if the fraud had been conceived independently of the mailings.

The distinction between mailing a letter to execute a fraud and merely taking advantage of a criminal opportunity created by a letter sent for a lawful purpose is at the heart of *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277

(1960). The defendants in that case controlled a school board. Among other things they mailed out school tax assessments and then stole the checks that the taxpayers sent in in response. The Supreme Court held that since the board was legally required to assess and collect taxes and the taxes it assessed were in no way unlawful, mailing the assessments did not violate the mail fraud statute. See *id.* at 390–92, 80 S.Ct. at 1183–84. The letters brought in the money that the defendants stole, but (so far as appeared, at any rate) the letters had been mailed in order to comply with the law rather than to enable a fraud. Likewise here, the letters brought in the people whom Green shook down but there is no reason to think they were sent because they would enable him to commit fraud.

There is an illuminating analogy to the Mann Act, which forbids transporting a woman for an immoral purpose (18 U.S.C. § 2421), just as the mail fraud statute forbids mailing a letter for a fraudulent purpose. If the immoral purpose is not a motivation for the transportation—if the transportation merely creates an opportunity for immoral activity—the defendant cannot be convicted. See, e.g., *United States v. Hon,* 306 F.2d 52, 55 (7th Cir.1962) ("while these two persons were engaging in a trip in interstate commerce for a proper purpose, she did incidentally engage in prostitution"). Similarly, in this case extortionate motives appear to have played no role in the sending of the letters, as distinct from the shaking down of the recipients when they came in to be interviewed. Green may be guilty of extortion but there is no evidence that he is guilty of the crime for which he was tried.

There is another and even surer path to this conclusion because it does not require that we speculate on what may have been in Green's mind when he sent the letters. Since, whatever was floating through Green's mind then, he would have mailed the letters anyway to hold on to his job, any evil intent on his part could not have been a necessary condition—or "but for" cause—of the mailing. This would (with an irrelevant exception) be a decisive objection to tort liability but not necessarily to criminal liability. If you shoot a person intending to kill him and your bullet hits him at the same moment that he dies from some unrelated and entirely innocent cause, you are not guilty of the tort of wrongful death, cf. *Weeks v. McNulty,* 101 Tenn. 495, 48 S.W. 809 (1898); Prosser and Keeton on the Law of Torts § 41, at pp. 265–66 (5th ed. 1984), but you are guilty of attempted murder, cf. *United States v. Thomas,* 13 U.S.C.M.A. 278, 32 C.M.R. 278 (1962); Shavell, *Criminal Law and the Optimal Use of Nonmonetary Sanctions as a Deterrent,* 85 Colum.L.Rev. 1232, 1253 (1985). The difference between that case and this, however, is that while shooting at another person is (in the absence of privilege) wrongful and dangerous conduct, mailing form letters pursuant to the orders of one's superiors is not; and conduct that is innocent is not usually criminal merely because it is done from a bad purpose.

In any event Green was not convicted of an attempted violation of the mail fraud statute. And to convict him of the completed crime the government had to show that the letters would not have been mailed had it not been for the fraudulent scheme—as is also clear from *Parr.* The Court said, "we think it cannot be said that mailings made or caused to be made under the imperative command of duty imposed by state law are criminal under the mail fraud statute, *even though some of those who are required to do the mailing for the District plan to steal, when or after received, some indefinite part of its moneys.*" 363 U.S. at 391, 80 S.Ct. at 1183 (emphasis added). The majority opinion in the present case calls this a dictum. The operational definition of dictum is, the part of a previous opinion that the court in the current case disagrees with. If what I have quoted is dictum, then what is the holding of *Parr?* That on the particular and nonrecurring facts the defendants could not be convicted?

Missing from both *Parr* and this case is a causal connection between the purpose

and the mailings; the mailings would have occurred anyway. This point has been a ground of decision in other cases besides *Parr*—showing that *Parr* is not some legal sport that we are free to ignore because the other courts of appeals have ignored it. See *United States v. Curry*, 681 F.2d 406, 412 (5th Cir.1982); *United States v. Boyd*, 606 F.2d 792, 794 (8th Cir.1979) (alternative holding); cf. *United States v. Brown*, 540 F.2d 364, 377 (8th Cir.1976). The causal point is implicit in *United States v. Murphy*, 768 F.2d 1518, 1529–30 (7th Cir.1985), where a judge took bribes from criminal lawyers to discharge their clients, and, upon discharge, the client's cash bond was refunded to his lawyer by mail. These were the mailings that we held violated the mail fraud statute. If the judge had not accepted the bribes, fewer cash bonds would have been refunded. This point, it is true, is not stated in the opinion; but that is because the opinion does not attempt to distinguish the part of *Parr* that deals with required mailings. *Parr* is cited, but for a different point. See *id.* at 1529. In *United States v. Mitchell*, 744 F.2d 701, 704 (9th Cir.1984), however, the causal point is explicit: "the fraudulent scheme triggered the mailings, *which would not have occurred except as a step in the scheme.*" (Emphasis added.) In *United States v. Bright*, 588 F.2d 504, 509–10 (5th Cir.1979), the court noted that "the mailings in *Parr* would have occurred irrespective of the defendants' embezzlement.... Here, by contrast, Mississippi's requirement of notice to the estate's creditors was triggered by the fraudulent scheme. If Whitten and Ray Bright had not decided to defraud the estate of their late cousin, they would not have had to comply with the state law requiring them to file the creditors' notice."

In *United States v. Wormick*, 709 F.2d 454, 461 (7th Cir.1983), the defendant was a policeman who participated in a scheme of defrauding insurance companies by reporting fictitious accidents and thefts. In one incident an insurance company mailed a check to a rental car agency to pay for the rental of a car by one of the fictitious accident victims. The mailing would not have been made but for the fraudulent scheme. *United States v. Fallon*, 776 F.2d 727, 729–32 (7th Cir.1985), and the other odometer-tampering cases, involved applications by mail for title documents for cars sold with altered odometers. Without the alterations the cars might not have been sold or might not have been sold so soon. The mailings were the last step in the execution of the fraud and the defendant could be said to have caused them to be made in order to complete, to perfect, the scheme; a person is held to intend the natural and probable consequences of his acts, even if he has no particular desire to bring them about. *United States v. McAnally*, 666 F.2d 1116, 1119 (7th Cir.1981). But if the acts (extortion) have no consequences (altering the pattern of mailings), other evidence of intent becomes necessary. (This assumes, though I do not believe, that we can ignore the part of *Parr* that requires proof that the mailings would not have occurred but for the defendant's fraudulent designs, a requirement not satisfied in this case.) As the same number of letters would have been sent at the same time to the same people, saying the same things, even if Green had been as pure as the driven snow, one can't reason from the mailings backward to the intent with which they were made. Yet no other evidence of intent was introduced—no evidence that if Green had had any discretion in the matter he would have mailed the letters. It seems that he had no intent to use the mails to further his scheme but merely took advantage of the happenstance that the mails brought him potential victims. I cannot see what difference it makes whether a Green steals money from letters replying to his invitations (*Parr*) or shakes down the addressees.

The difference between requiring proof of purpose and requiring proof of consequence (that the fraudulent scheme affected the timing, number, or contents of the mailings) is not great in practice, which may be why these elements are conflated in *Parr.* If the mailings are just what they

would have been if compliance with law had been the defendant's sole purpose, the government will find it impossible—unless the defendant makes an admission, or unless there is evidence that the defendant had taken the job in order to be in a position to execute a fraud—to prove the counterfactual proposition that even if the mailings had not been required the defendant would have made them. So the precise interpretation of *Parr* is unimportant; all that is important is that it forecloses conviction in a case with this record. I add that if the decision in this case stands, the mail fraud statute will be ludicrously encompassing. Suppose a clerk in a corner grocery store, as he is required by the nature of his job to do, mails hundreds of bills to customers with charge accounts, and steals from the cash register some of the checks he deposits there when the customers pay their bills—and is indicted on hundreds of counts of federal mail fraud. This hypothetical case (minus the hundreds of counts) was as a matter of fact argued to the Supreme Court by Parr's counsel, and seems to me the type of case the Court meant to rule out of the mail fraud statute and confine to the jurisdiction of state criminal law. The present case is indistinguishable.

Even if there was evidence from which it could be inferred that Green mailed the letters in order to execute the fraud, the instructions did not frame the jury's inquiry correctly. Prosecution and defense each submitted an instruction on mailing and the judge gave them both, resulting in the following mishmash:

> The government must prove that the United States mails were used to carry out the scheme. A defendant causes the mails to be used when use of the mails can reasonably be foreseen.

> Use of the mails need not be contemplated by the scheme and the defendant need not do any actual mailing.

> Although the item mailed need not contain a fraudulent representation or promise or request for money, it must further or attempt to further the scheme.

> Legally required mailings or routine mailings made in the regular course of business may further or attempt to further the scheme to defraud. It is for you to decide whether the mailings charged were in furtherance of the scheme.

This says: use of the mails must be reasonably foreseeable but need not be contemplated. Maybe this is an effort to distinguish between what is foreseen and what is foreseeable, but if so it is unclear; and since Green did the mailings there was no issue in the case as to whether the mailings were foreseen, foreseeable, or contemplated. These instructions also say that the mailings must be in furtherance of the scheme but that an attempt to further it is enough; yet the statutory language is execute or attempt to execute; and this is more precise, and narrower, than "further or attempt to further." The reference in the instructions to legally required mailings gets *Parr* backwards. Most important, the jury is not told that the *purpose* of the mailings must be to execute or attempt to execute the fraud.

An earlier instruction, in summarizing the elements of the crime, had told the jury that it must find that the government had proved (among other things) "that, for the purpose of carrying out the scheme or attempting to do so, the defendant used the United States mails or caused the United States mails to be used in furtherance of the scheme in the manner charged in the particular count." But the reference to purpose is obscure in this passage, and is hopelessly obfuscated by the specific instructions on mailing quoted earlier.

The instructions on mailing are a mass of confusion and irrelevance and it seems to me to make a mockery of trial by jury to allow a person to be sent to jail on the basis of what a jury might have thought such instructions required it to decide. The giving of them was plain error which we can correct even though the point was not preserved by the defendant. See Fed.R. Crim.P. 52(b). Plain error, it is true, is not just clear error, and not just clear error that is not harmless; it is clear error that

probably changed the outcome of the trial. *United States v. Silverstein,* 732 F.2d 1338, 1349 (7th Cir.1984). But that high standard is met here. If there is any evidence at all that Green mailed these letters for the purpose of executing this fraud—which I doubt—there is so little that if the jury had been told that it must find such purpose in order to convict Green, probably it would have acquitted him.

Finally, even if Green could on this record and these instructions have lawfully been convicted of mail fraud, he is entitled to a new trial on the distinct ground of the prosecutor's misconduct in accusing defense counsel of having stuck a double of Green at counsel table in order to prevent the prosecution's witnesses from identifying Green. This unfounded accusation was intended and likely to poison the jury against Green and shore up in a most improper way the weakest element in the government's case. It is no answer that defense counsel should have argued to the jury (as he did to us at argument) that the double was actually there to get credits toward qualifying for membership in the trial bar of the Northern District of Illinois. To make the argument credible he would have had to present evidence; and it was too late to do that in closing argument. Anyway, we can't expect counsel always to have the mental agility to respond effectively on the spot to an outrageous and unexpected sally by his opponent; and on the spot it would have to be, since this was closing argument. Although the evidence of extortion was strong, it was not so strong, given the vague and unimpressive testimony of the prosecutor's witnesses, that his dramatic *démarche* in closing argument can be dismissed as a harmless error. And while I agree that the error in excluding evidence of Novack's conviction was harmless viewed in isolation, it should not be viewed in isolation; when viewed in combination with the prosecutor's misconduct it was not harmless.

Although I have little doubt that Green is guilty of extortion (and of a RICO violation as well, see, e.g., *United States v. Kovic,* 684 F.2d 512, 517 (7th Cir.1982), the

predicate offenses for which include extortion punishable under state law, see 18 U.S.C. § 1961(1)(A)), I don't think he is guilty of mail fraud and I think his trial was unpardonably sloppy. The district judge may have thought the same, as no other explanation comes to mind for the extraordinarily light sentence that he imposed, under which Green will be eligible for parole in six months for a serious abuse of public office that made our streets less safe. A paltry sentence is no cure for a botched prosecution.